Timothy J. CASEY and David
L. Sinclair, Appellants,

v.

SEMCO ENERGY, INC., Appellee.

No. S–10830.

Supreme Court of Alaska.

June 11, 2004.

Bruce E. Gagnon and Jerome H. Juday, Atkinson, Conway & Gagnon, Anchorage, for Appellants.

John C. McCarron and Dani Crosby, Ashburn & Mason, P.C., Anchorage, for Appellee.

Before: FABE, Chief Justice, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Timothy Casey and David Sinclair appeal the superior court's decision that Semco Energy, Inc. did not breach the covenant of good faith and fair dealing when its counsel decided that their inclusion in an early retirement program would jeopardize the program's tax-exempt status under federal law. They argue that the superior court should have construed their severance contracts to provide them other benefits of the early retirement program that were not affected by federal law. Because the superior court properly interpreted the contract, and because the covenant of good faith and fair dealing does not add duties to a contract, we affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

In November 1999 Appellee Semco Energy, Inc. (Semco) purchased ENSTAR Natural Gas Company. The next month Semco terminated ENSTAR managers Timothy J. Casey and David L. Sinclair effective at the end of the year, despite its assurances, given during the negotiations for the sale, that it intended to retain ENSTAR's management. A condition of the sale was that the top management sign severance agreements, which they did in October 1999, providing for

lump-sum severance payments and several months of health insurance coverage in the event of involuntary termination or voluntary termination following a significant change in duties. Two other managers, Richard Barnes and Thomas Waldock, left ENSTAR voluntarily in early December 1999 after their salaries were reduced.

The four departing managers later decided that the severance agreements were inadequate, and Barnes and Waldock began negotiating for additional benefits on their collective behalf. On December 15, 1999 the parties raised the possibility that Semco would offer an early retirement program or plan (ERP), perhaps adding three or five years of age and service to an employee's existing benefit level, to encourage other ENSTAR employees to leave. Semco President Carl Porter said that if the ERP was offered he would "make it happen" for the four departing managers. A draft agreement to this effect dated December 16, 1999 provided that "[i]f SEMCO implements an Early Retirement Program on or before [date], Employee will be considered as having retired for purposes of that Early Retirement Plan. SEMCO makes no commitment to Employee that it will implement such a Plan." Waldock, an attorney, consulted an advisor who specialized in benefit plans who warned that applying any new ERP retroactively only to certain highly-compensated employees would probably disqualify the plan from tax-exempt eligibility under section 1051 of the Employee Retirement Income Security Act (ERISA).[1] Waldock passed this concern along to Bud Madigan, an attorney and one of Semco's primary negotiators on the issue.

Negotiations followed, and on January 14, 2000 the four managers signed settlement agreements under which they dropped all outstanding claims against Semco in exchange for large lump-sum severance payments, inclusion in the ENSTAR retiree medical program, and inclusion in the possible future ERP if the ERISA risk could be avoided. Specifically, paragraph II(D) of the settlement agreements provided:

> If Semco implements an Early Retirement Plan for the employees of the ENSTAR Natural Gas Division on or before June 30, 2001, Employee will, subject to the following provisions of this paragraph, be considered as having retired for purposes of that Early Retirement Plan. Employee will not be so considered *if, in SEMCO's sole judgment exercised in good faith, based upon an opinion of SEMCO's counsel,* the inclusion of the Employee in such an Early Retirement Plan would result in a risk that the ENSTAR Natural Gas Retirement Plan For Salaried Employees would no longer be a Qualified Plan under Section 401 of the Internal Revenue Code. SEMCO makes no commitment to Employee that it will implement such an Early Retirement Plan.

(Emphasis added.) At the time that this paragraph was drafted, Waldock warned all the managers in an e-mail that "we will be included UNLESS in SEMCO's sole judgment our inclusion would jeopardize the ERISA qualification of the Plan. SEMCO will not offer any cash payment in lieu thereof. You can bet that SEMCO will be VERY conservative when it assesses the risk of Plan disqualification."

In July 2000 Semco adopted an ERP consisting of a severance payment equal to nine months' pay, a twenty percent discount on co-payments for medical visits, and a pension plan enhanced by five years of age and five years of service. But Semco did not include the four managers in the plan. Semco submitted the question of ERISA disqualification to its actuary, Ray Shapiro, and its counsel, Larry Gagnon, both of whom issued opinions stating that allowing the managers to participate would jeopardize the tax status of the plan under ERISA. Waldock called Madigan in late August 2000 to ask whether the managers would be eligible for just the severance pay and health insurance aspects of the ERP, since these benefits would not disqualify the pension program. Waldock

---

1. 29 U.S.C.A. § 1051(2) (West 2003) (providing that tax exemption of employee pension plan under Employee Retirement Security Act shall not apply to "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees").

asked whether the opinion had been issued on the assumption that the ERP would be offered only to the four managers in question, or whether it would still be discriminatory if offered to all otherwise eligible employees who had retired in the period prior to the ERP being officially offered. Madigan responded that he had only instructed his advisors to investigate the possibility of discrimination if the four managers were included. Madigan then asked Gagnon to research how many otherwise eligible employees had retired or left ENSTAR during the relevant period. Gagnon discovered that no such employees had left during the relevant period, and wrote another opinion in late September 2000 stating that even if the discrimination testing had taken all relevant employees into account, there would still have been the risk of disqualification of the ERP's ERISA status.

### B. Proceedings

Casey and Sinclair filed suit in November 2000, alleging breach of contract, violation of the covenant of good faith and fair dealing, and misrepresentation. Trial was held on January 7–9, 2002 before Superior Court Judge John Reese. At trial, Casey and Sinclair presented the testimony of an expert, Norman Milks. Milks testified that Casey and Sinclair's inclusion in the ERP could indeed have created a risk of disqualification of the ERP's ERISA status, but that Semco could have provided Casey and Sinclair with the ERP benefits or their equivalent by creating a benefit plan that applied to any employee who retired at about the same time as the managers, by simply making lump-sum payments to Casey and Sinclair that were equivalent to the pension benefits, or by creating a "top hat" plan in which Casey and Sinclair would have received periodic cash payments equivalent to those under the ERP

pension. Milks also testified that Semco could have provided Casey and Sinclair with just the severance pay and medical co-payment aspects of the ERP without any risk to its ERISA status. Milks also testified that Semco could have eliminated the risk of ERISA disqualification by obtaining an opinion letter to that effect from the IRS.

The superior court denied all of Casey and Sinclair's claims. The court held that the settlement agreement only required Semco to obtain a good faith opinion from its counsel about whether inclusion of Casey and Sinclair in the ERP might jeopardize its ERISA status, that Semco had met this condition when Gagnon issued his opinion in good faith, and that any of Porter's statements that "we'll take care of it" were unclear and unenforceable in light of the settlement agreements' integration clauses. Casey and Sinclair appeal.

### III. STANDARD OF REVIEW

 We apply our independent judgment to questions of law,[2] including contract interpretation,[3] adopting the rule of law most persuasive in light of precedent, reason, and policy.[4] We review a trial court's factual findings for clear error, which is found when we are left with a definite and firm conviction based on the entire record that a mistake has been made.[5] Whether there has been a breach of the covenant of good faith and fair dealing is a question of fact, and is therefore reviewed only for clear error.[6] It is the function of the superior court, rather than this court, to weigh conflicting evidence and assess the credibility of witnesses.[7]

### IV. DISCUSSION

Casey and Sinclair challenge the superior court's factual findings, its application of the

2. *McCormick v. Reliance Ins. Co.*, 46 P.3d 1009, 1012 (Alaska 2002).

3. *Old Harbor Native Corp. v. Afognak Joint Venture*, 30 P.3d 101, 104 (Alaska 2001).

4. *Vezey v. Green*, 35 P.3d 14, 20 (Alaska 2001) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

5. *Id.* (internal citations omitted).

6. *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1223 (Alaska 1992). If the case presents only undisputed facts, then the covenant of good faith and fair dealing can be reviewed *de novo. Id.*

7. *Krossa v. All Alaskan Seafoods, Inc.*, 37 P.3d 411, 415 (Alaska 2001).

covenant of good faith and fair dealing to the agreement, and its refusal to "fill the gap" by granting them two of the three benefits of the early retirement program. We reject each of these challenges.

### A. The Parties Did Not Intend the Settlement Agreements To Require Semco To Exhaust All Means of Including Casey and Sinclair in the Early Retirement Plan.

■ The goal of contractual interpretation is to give effect to the reasonable expectation of the parties.[8] We consider disputed language in its context in the contract as a whole and look to the purposes of the contract, the circumstances surrounding its formation, and the case law on similar contractual provisions.[9] The parol evidence rule provides that an integrated contract (one that is intended to describe the entire agreement) cannot be varied through the introduction of evidence about prior negotiations or agreements.[10] However, extrinsic evidence is always admissible on the question of the meaning of the words of the contract itself.[11] If the parties disagree about the interpretation of a provision, we inquire into what the parties knew or had reason to know of each other's position;[12] a party prevails when he or she did not know or have reason to know that the other side interpreted the provision differently, but the other party did know or have reason to know of the disagreement.[13] When a phrase in a contract is understood differently by the parties and is sufficiently ambiguous to support both meanings, no contract exists.[14]

Casey and Sinclair contend that the true meaning of paragraph II(D) was that "Semco [could] avoid giving Casey and Sinclair the early retirement benefits only if there was a risk of ERISA disqualification that Semco could not avoid by reasonable means." They argue that their interpretation is consistent with the purpose of the settlement agreements, which was to give them more benefits than they had obtained in the severance agreements. They also argue that their interpretation is consistent with Porter's statements that he would "make it happen" for them and Madigan's statements that he expected that Semco would "find a way to put them in the plan if [it] could." In effect, they argue that the superior court should have weighed the testimonial evidence more heavily in their favor. We reject that argument.

■ It is the role of the trial court, not the appellate court, to evaluate the credibility of the witnesses and to weigh the evidence.[15] Although Sinclair testified that his understanding of "good faith" was that Semco would have to make serious efforts to include him in the early retirement plan, he also suggested that his expectation that he would be included was based more on Carl Porter's statements, which he received second-hand, than on the words of the settlement agreement. In contrast, Madigan testified that the disputed language had been drafted at the last moment and that his intent was to "put them in the plan if we could do it without a risk to qualification," not to research alternative ways to approximate benefits similar to those in the plan if the risk of disqualification was determined to exist. The court found Madigan's testimony to be "credible and convincing." There was ample evidence to support the superior court's decision to accept Semco's rather than Casey and Sinclair's version of the facts.

Casey and Sinclair argue that the superior court's interpretation of the contract constitutes legal error because it violates the rule

---

8. *Exxon Corp. v. State*, 40 P.3d 786, 793 (Alaska 2001).

9. *Zuelsdorf v. Univ. of Alaska, Fairbanks*, 794 P.2d 932, 934 (Alaska 1990).

10. *Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 583 (Alaska 1989).

11. *Id.* at 584 (citing RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. b (1981)).

12. *Id.* at 584 n. 3 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. b).

13. RESTATEMENT (SECOND) OF CONTRACTS § 201(2).

14. *Krossa v. All Alaskan Seafoods, Inc.*, 37 P.3d 411, 416 (Alaska 2001).

15. *Id.*

that contracts should be interpreted so as to give effect to all their provisions and to find all provisions meaningful to the extent that this is possible.[16] They point out that a certain amount of ERISA risk had already been identified by the time that the final version of paragraph II(D) was drafted—indeed, this risk was the very reason why the paragraph was redrafted—and that conditioning their inclusion in the plan on a risk assessment by Semco's counsel would be a redundant exercise, the outcome of which was almost certain. Thus, they claim, it is more reasonable to interpret paragraph II(D) as requiring Semco to find a way to include them. Semco argues that requiring it to find a way to include Casey and Sinclair by any reasonable means renders part of the text of paragraph II(D) meaningless.[17] The central mystery of Casey and Sinclair's case is why they would agree to such a narrowly drawn provision, especially in light of their representative's warnings that "SEMCO will not offer any cash payment in lieu" of the plan and "[y]ou can bet that SEMCO will be VERY conservative when it assesses the risk of Plan disqualification."

Nonetheless, "parties are free to make arrangements that seem unreasonable to others."[18] The intent of the parties is the primary issue, and their intent can be drawn from extrinsic evidence, especially their express attempts to comply with the contract as they understood it.[19] Based on the superior court's factual findings regarding the parties' intent in drafting the contractual language, and upon our reading of that language, we hold that paragraph II(D) required only that Semco obtain its counsel's good faith opinion regarding ERISA disqualification.

### B. The Covenant of Good Faith and Fair Dealing Did Not Require Semco To Find a Way To Include Casey and Sinclair in the Early Retirement Plan.

Casey and Sinclair argue that because the covenant of good faith and fair dealing requires a party to take reasonable steps to ensure the occurrence of a condition precedent to a contract, Semco had to take reasonable steps to include them in the ERP. Because the covenant of good faith and fair dealing cannot add terms to a contract or prohibit what a contract explicitly permits, we reject Casey and Sinclair's claim that Semco breached the covenant of good faith and fair dealing.

The covenant of good faith and fair dealing is implied in all contracts in Alaska.[20] "[W]here a party has promised to attempt to satisfy a condition, the attempt must be made in good faith."[21] A party must act in subjective good faith, meaning that it cannot act to deprive the other party of the explicit benefits of the contract, and in objective good faith, which consists of acting in a manner that a reasonable person would regard as fair.[22] "Where a duty of one party is subject to the occurrence of a condition, the additional duty of good faith and fair dealing ... may require ... refraining from conduct that will prevent or hinder the occurrence of that condition or ... taking affirmative steps to cause its occurrence."[23] But the purpose of the covenant is to effectuate the reasonable expectations of the parties, not add to them,[24] and "cannot be interpreted

16. *See, e.g., Grant v. Anchorage Police Dep't,* 20 P.3d 553, 556 (Alaska 2001); *Peterson v. Wirum,* 625 P.2d 866, 872 n. 11 (Alaska 1981).

17. *See Grant,* 20 P.3d at 556.

18. Restatement (Second) of Contracts § 203 cmt. c.

19. *Sprucewood Inv. Corp. v. Alaska Hous. Fin. Corp.,* 33 P.3d 1156, 1162 (Alaska 2001).

20. *Ellingstad v. State, Dep't of Natural Res.,* 979 P.2d 1000, 1009 (Alaska 1999).

21. *Gordon v. Foster, Garner & Williams,* 785 P.2d 1196, 1199 (Alaska 1990).

22. *Ramsey v. City of Sand Point,* 936 P.2d 126, 133 (Alaska 1997).

23. *Gordon,* 785 P.2d at 1199 n. 6 (quoting Restatement (Second) of Contracts § 245 cmt. a).

24. *Era Aviation, Inc. v. Seekins,* 973 P.2d 1137, 1141 (Alaska 1999).

to prohibit what is expressly permitted." [25]

Casey and Sinclair rely on the doctrine that a party cannot be excused from contractual performance by the nonoccurrence of a condition over which that party has control. The Restatement (Second) of Contracts section 245 provides that "[w]here a party's breach by non-performance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused." [26] The classic case of a breach of the covenant of good faith and fair dealing regarding contractual conditions occurs when an obligation is conditioned on a party's ability to obtain financing or insurance, but the party fails to make reasonable efforts to obtain such financing or insurance.[27] Where a condition is within the sole control of a single party, most authorities require that party to take "reasonable" steps to obtain the occurrence of the condition.[28] The superior court found that Semco and its agents acted in good faith, both subjectively and objectively, in fulfilling Semco's contractual obligations to Casey and Sinclair. It also found Casey and Sinclair's argument that Semco could have included them in a separate retirement plan to be irrelevant because "neither the express language of the Settlement Agreements nor the implied good faith and fair dealing covenant require[s] Semco to provide more than the parties bargained for."

Casey and Sinclair argue that taking reasonable steps to obtain the occurrence of the condition required Semco to "consider[ ] ways to extend the benefits of the plan" to them. They argue that the superior court misunderstood the application of the covenant of good faith and fair dealing to their case, because the superior court read the settlement agreements as requiring Semco only to submit the question of whether Casey and Sinclair's inclusion would create a risk of ERISA disqualification to counsel, and as requiring Semco's counsel to consider the question in accordance with the law and without being arbitrary.

■ The superior court was correct in its interpretation of paragraph II(D) of the settlement agreements. "The covenant of good faith and fair dealing is implied in every contract in order to effectuate the reasonable expectations of the parties to the agreement, not to alter those expectations." [29] The covenant of good faith and fair dealing "will not create a duty where one does not exist." [30] The doctrine "does not provide courts with carte blanche to rewrite contracts" [31] and cannot be interpreted to permit what is expressly prohibited by the contract.[32] While the text of paragraph II(D) promises Casey and Sinclair that they *could* be included in the ERP, it specifically disclaims any responsibility for Semco to adopt an ERP, and further conditions their inclusion on Semco's counsel not finding any potential risk to the ERP's ERISA qualification. The language is so carefully hedged that Semco has very little responsibility at all; it must merely adopt a plan and submit it to counsel for an opinion. Moreover, the paragraph defines "implement[ing] an Early Retirement Plan" as "amend[ing] the ENSTAR Natural Gas Retirement Plan for Salaried Employees ... to provide enhanced benefits (such as increased years of service) which function as incentives to employees to accelerate termination of employment to a date preceding

25. *Ramsey*, 936 P.2d at 133.

26. *Quoted in Gordon*, 785 P.2d at 1199 n. 6, and *Klondike Ind. Corp. v. Gibson*, 741 P.2d 1161, 1167 (Alaska 1987).

27. *E.g., Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.*, 807 F.Supp. 1007, 1022–24 (S.D.N.Y.1992) (finding breach of covenant of good faith and fair dealing where party refused to proceed with certain meetings and finance agreements so as to obtain financing for contract); *Gordon*, 785 P.2d at 1199–1200 & n. 8 (remanding to find whether intent of parties required party to attempt to obtain insurance, or actually required insurance itself).

28. *Dayan v. McDonald's Corp.*, 125 Ill.App.3d 972, 81 Ill.Dec. 156, 466 N.E.2d 958, 972 (1984); JOHN EDWARD MURRAY, JR., MURRAY ON CONTRACTS § 111(B), at 622–23 (3d ed.1990).

29. *Ramsey*, 936 P.2d at 133 (internal citation omitted).

30. *Lorenz v. CSX Corp.* 736 F.Supp. 650, 656 (W.D.Pa.1990).

31. *Id.*

32. *Ramsey*, 936 P.2d at 133.

July 1, 2001." It would considerably increase Semco's duties to require it to put forth all reasonable efforts to structure the plan so that these four employees may be included, or to put forth all reasonable efforts to provide benefits to these employees that are similar to but outside of the structure of the plan. Since Casey and Sinclair do not allege that Semco and its counsel reached their conclusion about ERISA disqualification in bad faith—indeed, their own expert agreed that such a risk existed—we uphold the superior court's conclusion that there was no breach of the covenant of good faith and fair dealing.

Casey and Sinclair also argue that Semco breached the covenant of good faith and fair dealing by refusing to grant them the severance pay and medical benefit components of the ERP solely because they were ineligible for the pension aspect of the ERP. They argue that this violated the covenant as defined in Restatement section 205, which states that a breach of the covenant includes "abuse of power to specify terms." [33] While Semco could have provided those benefits, it was not required to do so under the settlement agreement. Therefore we affirm the holding of the superior court that Semco did not breach the implied covenant of good faith and fair dealing.

### C. The Superior Court Did Not Err in Declining To "Fill the Gap" in the Agreements by Requiring Semco To Give Casey and Sinclair Two of the Three Components of the Early Retirement Plan.

Finally, Casey and Sinclair argue that because the ERISA risk foreseen in paragraph II(D) affected only one of the three components of the ERP—the enhanced pension benefit adding five years of age and five years of service, but not the additional twenty percent of medical visit co-payments to be paid by the company or the nine months transitional pay in a lump sum—the parties had left a "gap" in the contract. Casey and Sinclair argue that the superior court should

have filled this gap by implying a new term granting them the two remaining benefits of the ERP. Semco responds that "filling the gap" in this manner would be inappropriate because Semco never would have agreed to the terms proposed by Casey and Sinclair.

▮▮▮▮▮ A court may supply an essential term that has been omitted from an otherwise sufficiently defined contract. [34] Because the parties cannot plan for all contingencies that might arise, a court may fill in gaps to ensure fairness where the reasonable expectations of the parties are clear. [35] But based on the integration clauses in the settlement agreements and the superior court's findings regarding the parties' intent, we conclude that there were no contractual gaps to fill.

The threshold inquiry in determining whether this case is an appropriate one for "gap-filling" is whether, in fact, there is an essential term or circumstance for which the parties failed to plan. Casey and Sinclair argue that their settlement agreements were "skeletal" ones in which the possibility of only one aspect of the plan causing a risk to ERISA qualification was never discussed or planned for, primarily since the content of the future Semco ERP amendment was unknown at the time. But our reading of the contractual language and the superior court's factual finding regarding the intent of the parties lead us to conclude that Semco was required under the contract only to obtain a good faith legal opinion from its counsel as to whether inclusion of Casey and Sinclair in the ERP would risk disqualification under ERISA. The settlement agreements were fully integrated: Both contain integration clauses that state, "[t]his is the entire Agreement between Employee and SEMCO. SEMCO has made no promises to Employee other than those in this agreement." We therefore reject Casey and Sinclair's argument that the superior court should have read new terms into the agreement in order to fill contractual gaps because we find that there were no gaps to fill.

---

**33.** Restatement (Second) of Contracts § 205 cmt. d (1981).

**34.** *Id.* at § 204.

**35.** *Magill v. Nelbro Packing Co.*, 43 P.3d 140, 142 (Alaska 2001).

## V. CONCLUSION

Because the superior court did not err in its interpretation of the severance agreements, we AFFIRM.

MATTHEWS and EASTAUGH, Justices, not participating.