WINSTON J., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, OFFICE OF CHILDREN'S SERVICES, Appellee.

No. S–12002.

Supreme Court of Alaska.

April 28, 2006.

---

Lori M. Bodwell, Conflict Counsel, Fairbanks Section, Office of Public Advocacy, Fairbanks, for Appellant.

Dan N. Branch, Assistant Attorney General, and David W. Márquez, Attorney General, Juneau, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. INTRODUCTION

Twins Tanya and Wilfred G.[1] were born while their father was incarcerated for assaulting their mother. They were immediately taken into state custody and placed with their mother's aunt. Two years later, the Office of Children's Services (OCS) brought a petition to terminate the parental rights of both parents. The superior court terminated the parental rights of both parents and approved the permanent placement of the twins with their great aunt. The father appeals. Because the superior court did not err in finding (a) that OCS made reasonable efforts to reunite the father with his children, (b) that the children were in need of aid, and (c) that the father did not remedy his conduct, we affirm the order terminating the father's parental rights.

## II. FACTS & PROCEEDINGS

### A. Facts

Twins Tanya and Wilfred G. were born in Fairbanks to Tricia G. on April 12, 2003. The children were born prematurely and spent the first month of their lives in intensive care at Fairbanks Memorial Hospital. On May 8, 2003 the state brought a petition requesting that the children be adjudicated in need of aid and that they be taken into state custody. The petition noted that Tricia was reportedly "a chronic drug abuser" and was failing to show up at appointed times to feed the twins. Their father was not present at all. The twins tested positive for Hepatitis C at birth but negative for any drugs. It was later established that both children were exposed to cocaine during the pregnancy.

In May 2003 Superior Court Judge Richard D. Savell found the children to be in need of aid and placed them in the custody of the state. The court stated that "the father was identified as [Winston J.]. He is currently

---

1. Pseudonyms have been used throughout this opinion to protect the identity of the parties.

incarcerated. He is not listed on the birth certificates, so paternity must be established." Winston was incarcerated for a domestic assault on Tricia which occurred when she was eight months pregnant. He "chas[ed] her around [a] truck" and "kicked at her." Winston has a long history of domestic assaults. In 1993 a restraining order was obtained against him in Fairbanks by a former girlfriend on her complaint that he had choked her and slammed her head several times against a wall. He was incarcerated for a domestic assault in Yakima, Washington in 1998. He was later incarcerated for domestic assault in Spokane, Washington. All of these assaults involved different women. He was also convicted of driving under the influence in Seattle in 1990.

The superior court committed the children to state custody for a period of up to two years in September 2003. The court found that Winston

> was incarcerated until early August, and indicated that he did not wish to participate in a case plan or services until his criminal case had been resolved. Since being released from custody, the father has not engaged in services, nor has he identified himself to the social worker so that services and visits between the father and the children could commence.

Rather than attempting to establish a relationship with his children, Winston went to Seattle after his release. Tricia apparently lived with him there from time to time. In January 2004 Winston took a paternity test which definitively established him to be the twins' father.

Winston returned to Alaska for a week-long visit in March 2004. While in Fairbanks he met with a social worker and signed a case plan aimed at allowing the children to live with him. During the visit Winston underwent parenting skills and anger management assessments. As a result of the assess-

ment in Fairbanks, OCS recommended that Winston complete a full-year "Alternatives to Violence" program. The social worker recommended a specific program in Seattle in a letter of April 15, 2004. Following substantial delays because Winston was out of touch with OCS, Winston started the program in or around November 2004, but stopped after attending two classes.

### B. Proceedings

On December 23, 2004 OCS filed a petition to terminate Tricia's and Winston's parental rights to the twins.[2] The petition was tried before Judge Savell in May 2005. Judge Savell found that Winston and Tricia had "failed to remedy the conduct or conditions that made the children in need of aid. The court cannot return children to the parents without substantial risk of physical and mental injury." The court found by a preponderance of the evidence that the state made reasonable efforts to reunite the children with their parents and found it to be in the best interests of the children to terminate the parental rights of Winston and Tricia. The termination order was issued on June 23, 2005.[3] Winston appeals the termination of his parental rights, arguing that the superior court erred in finding (1) that OCS had made reasonable efforts to reunite him with his children, (2) that the twins were in need of aid, and (3) that he had failed to remedy the conditions that caused the children to be in need of aid. Tricia does not appeal.

### III. STANDARD OF REVIEW

It is a question of law whether the superior court's findings are consistent with child-in-need-of-aid rules and statutes.[4] We review questions of law using our independent judgment.[5] Factual findings underlying the superior court's termination decision are

---

**2.** OCS was required to file a petition at this point because the children had been in state custody for more than fifteen of the previous twenty-two months. AS 47.10.088(d)(1).

**3.** Since Judge Savell retired on the day the trial ended, the termination order was signed by Superior Court Judge Robert Downes.

**4.** *Jeff A.C., Jr. v. State*, 117 P.3d 697, 702 (Alaska 2005).

**5.** *Id.*

reviewed for clear error.[6] Clear error exists when we are left with "a definite and firm conviction that the superior court has made a mistake."[7]

## IV. DISCUSSION

### A. The Superior Court Did Not Err in Finding that OCS Made Reasonable Efforts To Reunite Winston with his Children.

### 1. We need not determine whether OCS was required to make reasonable efforts until paternity was definitively established.

■ OCS argues that it was not required to make reasonable efforts until it was definitively established that Winston was the twins' father.[8] OCS analogizes to child welfare cases in the context of the Indian Child Welfare Act (ICWA).[9] We have held that "ICWA did not obligate the State to provide such efforts until . . . paternity had been established."[10] As OCS acknowledges, however, ICWA defines "parent" much more restrictively than do the Alaska statutes; ICWA excludes "the unwed father where paternity has not been acknowledged or established."[11] In Alaska custody proceedings, however, " 'parent' means the biological or adoptive parent of the child."[12] But we need not decide this question now. As we conclude in the following section, OCS met its reasonable efforts burden in any event.

### 2. OCS made reasonable efforts.

OCS was required to demonstrate, by a preponderance of the evidence, that it had made reasonable efforts to prevent the breakup of the family.[13] Under AS 47.10.086(a), OCS is required to "make timely, reasonable efforts to provide family support services . . . to the parents . . . of the child that are designed to . . . enable the safe return of the child to the family home, when appropriate." We have stated that we allow the "state to consider the 'amount of time available' for reunification, considering how long the child has been in foster care and whether allowing more time for reunification would not be in the child's best interests."[14]

At trial, the superior court rejected Winston's argument that not enough services were provided. The court stated:

> It is ironic that in Mr. [J.]'s case we're told that not enough services were entered. The normal argument which has been well received from this court and has some weight to it is, Judge, you put too much on this person's plate, they couldn't do it all, it would've been more appropriate, Judge, for . . . OCS to triage these needs and give [the] person one task and one step at a time. . . . Under the circumstances here and given Mr. [J.]'s response . . . I can't fault the state for not . . . load[ing] these services on Mr. [J.]'s plate.

The court's implied finding that OCS had made reasonable efforts is supported by the record: OCS provided parenting and anger management assessments to Winston, and directed him to parenting classes and alternatives to violence counseling. OCS also brought Winston to Alaska at state expense to see his children. Winston argues on appeal that in failing to provide a recommended mental health evaluation for Winston, OCS failed to make reasonable efforts to reunify the family.

The court's ruling indicates that it believed OCS provided an appropriate level of services under the circumstances. Winston initially informed OCS, when OCS contacted him in prison, that he did not want to be contacted regarding the children until his

---

6. *Id.*

7. *Id.*

8. Alaska Statute 47.10.086(a) directs OCS to make reasonable efforts to "provide family support services" to the "child and parents or guardian of the child."

9. 25 U.S.C. §§ 1901–1963 (2000).

10. *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 262 (Alaska 1999).

11. 25 U.S.C. § 1903(9) (2000).

12. AS 47.10.990(19).

13. CINA Rule 18(c)(2)(A); AS 47.10.086.

14. *Jeff A.C., Jr. v. State,* 117 P.3d 697, 706 (Alaska 2005).

criminal case was resolved. Upon his release, he did "not ... identif[y] himself to the social worker so that services and visits between the father and the children could commence." We have indicated that reasonable efforts should be "reasonably calibrated to the interest in parenting demonstrated by" the parent.[15] When Winston initially demonstrated *no* interest, the state's efforts were appropriately less. As Winston became more involved, then the state offered more services. It seems clear from the record that Winston eventually showed a substantial interest in raising his twins. Unfortunately, he was not able to make enough progress in the short time that he had allowed himself.

Not only Winston's level of interest but also his actions must be considered.[16] Upon his release from prison he returned to Washington rather than contact OCS or his children. While he eventually did participate in assessments required by OCS, visited the children multiple times, and took anger management classes, Winston failed to complete the case plan he signed. The state initiated an interstate placement review under AS 47.70.010 while Winston was in Washington, sending a social worker to visit him in Seattle. Interstate placement was denied, however, due to Winston's "lack of participation."

Most significantly, he attended only two sessions at a one-year program set up for him in Seattle by OCS. This despite Winston's understanding that "if he went to this program, he would likely have his kids back." The social worker assigned to Winston testified that she "reiterated to him that if you just show an effort, ... that you're trying, that's the only thing, just as long as you're trying to get your children back." As the children's guardian *ad litem* testified, Winston "had only one major hurdle to overcome," but did not make the effort, attending only two sessions of the year-long class.

Finally, he ceased making efforts completely when OCS notified him in December 2004 that it intended to file a termination petition in fairly short order. The superior court correctly found that the state's termination petition was a warning: that Winston's failure to obtain the services he needed would lead to termination. At this point the children were twenty months old but had never lived with Winston and had no prospects of doing so. The superior court indicated that it viewed the filing of the termination petition as "the last chance" allowing the parents time to demonstrate that conditions had been remedied.

Considered as a whole, the record indicates that OCS made reasonable efforts to reunite Winston with his twins. The state flew Winston up to Fairbanks from Seattle for the evaluations it conducted. It arranged for him to see his children while in Fairbanks. It arranged, long-distance, for Winston to attend a comprehensive, year-long anger management counseling program in Seattle. It appears from the record that the social·workers on the case were reasonably diligent in attempting to follow up on Winston's progress. Furthermore, Winston was directed to attend parenting classes by the court as a condition of his probation. Winston failed to attend the classes. We take into account the actions of the parent involved and look at the state's efforts "in their entirety,"[17] including actions taken by other state agencies.[18] While the state's actions here might not have been a model of efficiency,[19] the law does not require perfect efforts, just reasonable ones, and the record indicates that the state made reasonable efforts.

---

**15.** *Id.* at 707.

**16.** *See id.* ("[T]he state, in determining what efforts to reunite parent and child are 'reasonable,' may consider the parent's actions.").

**17.** *Frank E. v. State, Dep't of Health & Soc. Servs.,* 77 P.3d 715, 720 (Alaska 2003).

**18.** *See T.F. v. State, Dep't of Health & Soc. Servs.,* 26 P.3d 1089, 1095–96 (Alaska 2001); *A.M. v. State,* 945 P.2d 296, 305 (Alaska 1997) (considering efforts made by Department of Corrections).

Although *T.F.* and *A.M.* are ICWA cases, their reasoning on this point is applicable to non-ICWA cases because the "active efforts" requirement of ICWA is more demanding than the "reasonable efforts" requirement of AS 47.10.086.

**19.** For example, OCS did not arrange paternity testing for eight months after the children were born, despite Judge Savell's comment that "paternity must be established," and even though Winston was incarcerated and available.

### B. The Superior Court Did Not Err in Finding the Twins To Be in Need of Aid and in Finding that Winston Had Failed To Remedy the Conditions that Caused Them To Be in Need of Aid.

■ Winston argues that the superior court erred in finding the twins to be in need of aid under AS 47.10.011(8). That statute provides, in relevant part, that a child can be adjudged to be in need of aid if "conduct by or conditions created by the parent . . . have . . . (B) placed the child at substantial risk of mental injury as a result of (i) a pattern of rejecting, terrorizing, ignoring, isolating, or corrupting behavior that would, if continued, result in mental injury." At trial, the superior court found that this statute was satisfied: "[t]he domestic violence . . . placed the children in risk of exposure that we know causes mental harm, that could cause physical harm." Winston argues that the court misread the statute because the children had not been born when the incident of domestic violence against their mother occurred and that the statute "does not allow the court to make findings based on prospective acts of domestic violence." We disagree: The court still could reasonably find that Winston's commission of domestic violence against the twins' mother coupled with his history of violence against other women created a substantial risk of harm to them should they be placed with him.

As the state notes, we rejected an argument similar to Winston's in *Martin N. v. State*.[20] That case involved a father who, like Winston, was shown to have committed several acts of violence against the child's mother and others, but none against the child.[21] Also like Winston, Martin committed one of the acts of violence against the mother when she was pregnant.[22] Martin N. argued that because he had never directed violence against his child, the state had not shown that the child faced "a substantial risk of mental injury" under AS 47.10.011(8)(B)(i).[23] We firmly rejected that argument:

The statute itself directs the court to the question of whether the child would be mentally injured if the behavior is "continued," thereby contemplating an analysis of future harm. . . . We have previously held that witnessing domestic violence is mentally harmful to children. There was clear and convincing evidence that Martin's acts toward [the mother] create a significant risk of mental injury to [the child] if continued.[24]

Judge Savell's conclusion in the present case is perfectly consistent with our holding in *Martin N.* Winston's argument focuses on the fact that the children never witnessed domestic violence, but this is because they were *in utero* when it first occurred and Winston was incarcerated (for committing the domestic violence) when the twins were born. In order to remedy the potentially injurious circumstances in the home environment, Winston was obligated to address his repeated problems with domestic violence. As he did not do so, the superior court was justified in holding that he had not remedied the conditions that caused the children to be in need of aid. As the superior court noted in its findings, "the law and society have recognized [that] the priority [is] these two little kids, not the parents' feelings."

Especially when young children are involved, it is important that a parent with a history of violent behavior—particularly one as long and serious as Winston's—address the causes of the behavior. As noted, Judge Savell found that "the domestic violence . . . placed the children in risk of exposure that we know causes mental harm [and] that could cause physical harm." This finding was starkly supported by the family assessment: "[Winston] reported the intent to use spanking and slapping the hand to discipline his children and believes that they are already at an age where this would be appropriate to implement." At the time of this statement the children were barely a year old.

20. 79 P.3d 50 (Alaska 2003).

21. *Id.* at 54.

22. *Id.* at 51.

23. *Id.* at 54.

24. *Id.* at 55 (footnote omitted).

## V. CONCLUSION

Because the superior court did not err in finding that OCS made reasonable efforts to ensure that the children could be returned to Winston, and it did not err in finding that the twins were in need of aid and that Winston had failed to remedy the conditions that caused them to be in need of aid, we AFFIRM the judgment of the superior court.