**RENAISSANCE ALASKA, LLC, Appellant,**

v.

**RUTTER AND WILBANKS CORPORATION, Appellee.**

No. S–13839.

Supreme Court of Alaska.

Oct. 28, 2011.

**36**

David J. Mayberry and Kyle W. Parker, Crowell & Moring LLP, Anchorage, for Appellant.

Patrick B. Gilmore, Atkinson, Conway & Gagnon, Anchorage, for Appellee.

Before: CARPENETI, Chief Justice, FABE, WINFREE, CHRISTEN, and STOWERS, Justices.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

■ Renaissance Resources Alaska, LLC (Renaissance) partnered with Rutter and Wilbanks Corporation (Rutter) to develop an oil field. Acting together, Renaissance and Rutter acquired a lease to the entire working interest and the majority of the net-revenue interest of the field.[1] Renaissance and Rutter, along with Arctic Falcon Exploration, LLC (which is not involved in this litigation), then formed a limited liability company, Renaissance Umiat, LLC (Umiat LLC), to which they contributed most of the lease rights. But when they formed Umiat LLC, Renaissance and Rutter did not contribute all of their acquired lease rights to the new company: They retained a 3.75% overriding royalty interest, commonly known as an "ORRI."[2] Rutter was eventually unable to meet the capital contributions required by Umiat's operating agreement and forfeited its interest in Umiat under the terms of the operating agreement. Rutter filed suit against Renaissance Alaska, LLC (Renaissance), the successor LLC of Renaissance Resources Alaska, LLC, seeking a declaratory judgment that it was entitled to half of the retained 3.75% ORRI.[3] Both parties agree that there was never any express agreement, written or oral, discussing the 3.75% ORRI.

Renaissance has two arguments for why it deserves the entire 3.75% ORRI. First, Renaissance argues that it holds legal title to the 3.75% ORRI and that Rutter can only obtain title through an equitable remedy, to which Rutter is not entitled. We affirm the superior court's conclusion that Renaissance's characterization is inaccurate and that Rutter was entitled to title to half of the 3.75% ORRI. Second, Renaissance argues that the superior court should have found an implied term that Rutter would forfeit its share of the 3.75% ORRI if Rutter failed to contribute its share of expenses. We affirm the superior court's determination that there was not such an implied term in the agreement.

## II. FACTS AND PROCEEDINGS

■ In 2004 or 2005 Renaissance contacted Rutter about partnering to develop an oil field in the National Petroleum Reserve–Alaska. The oil field was on land owned by the federal government that had been previously leased to Paul Craig and Peter Zamarello. Craig and Zamarello's lease entitled them to 100% of the working interest and 87.5% of net-revenue interest from the field. A 12.5% royalty interest[4] was retained by

---

1. A working interest is "the interest created out of a lease authorizing the holder of that right to enter upon the leased lands to conduct drilling and related operations, including production of oil or gas from such lands in accordance with the terms of the lease." Oil and Gas Leasing, 43 C.F.R. § 3100.0–5(d) (2011).

2. "An overriding royalty interest is 'a percentage of the gross production payable to some person other than the lessor or persons claiming under the lessor.'" *Allen v. Alaska Oil & Gas Conserva-*

tion Comm'n, 1 P.3d 699, 700 n. 1 (Alaska 2000) (quoting 38 AM.JUR. 2d *Gas & Oil* § 215 (1999)).

3. In this opinion, two entities are referred to as "Renaissance." In November 2006, Renaissance Resources Alaska, LLC transferred its interest to Renaissance Alaska, LLC.

4. "A royalty interest is 'a right to receive a specified percentage of all oil and gas produced' but, unlike the oil payment, is not limited to a specified sum of money. The royalty interest lasts

the federal government. Renaissance and Rutter approached Craig and Zamarello about examining and purchasing the lease. To encourage a sale, Craig and Zamarello granted Renaissance a free 90–day option to purchase the lease. The option agreement gave Renaissance the option to purchase Craig and Zamarello's full 100% working interest in the lease and 84.5% of the net-revenue interest in exchange for $1 million. Craig and Zamarello would retain a 3% ORRI on any eventual oil production. The option agreement required Renaissance to complete an engineering study before Renaissance could exercise the option.

Once the study was completed, Renaissance and Rutter decided to exercise the option as "50/50 partners." Renaissance and Rutter signed an agreement (the May 23 Agreement) under which Rutter would solicit investors for the $1 million necessary to exercise the option and then Renaissance and Rutter would pursue development as partners. Because Renaissance and Rutter believed that each owner of a federal oil lease must post a $100,000 bond, they decided to keep all lease documents in Renaissance's name alone and post one bond instead of two. Accordingly, the sales agreement with Craig and Zamarello listed only Renaissance as the purchaser. The sales agreement between Craig and Zamarello and Renaissance imposed several obligations on Renaissance as purchaser. Within approximately 18 months after acquiring the lease, Renaissance was obliged to spend $10 million developing the lease or pay Craig and Zamarello $250,000 for a one-year extension. If Renaissance failed to do either of these things, then the agreement obligated Renaissance to transfer the lease back to Craig and Zamarello. Rutter arranged a bridge loan of $1 million to finance the purchase. The terms of the loan entitled the lenders to a $1.2 million note and a 0.75% ORRI.

When the sale was complete, several parties were entitled to royalties. The federal government was entitled to 12.5% of the royalties under the terms of its initial lease

to Craig and Zamarello; Craig and Zamarello were entitled to a 3% ORRI under the sales agreement; and the bridge lenders were entitled to a 0.75% ORRI. Renaissance and Rutter were entitled to the remainder of the net-revenue interest: 83.75%.

Renaissance and Rutter then focused on acquiring another lease interest held by Arctic Falcon Exploration, LLC (Arctic Falcon). Renaissance, Rutter, and Arctic Falcon agreed to pool their lease interests in a new entity in order to pursue development. In February 2007 they formed Renaissance Umiat, LLC (Umiat LLC), an Alaska limited liability company, with Renaissance, Rutter, and Arctic Falcon as members.

The dispute in this litigation is directly traceable to the negotiations with Arctic Falcon. Renaissance and Rutter had apparently planned to contribute their entire 83.75% net-revenue interest to Umiat LLC, the new entity, but Arctic Falcon insisted on retaining an ORRI from its own lease contribution and only planned to contribute an 80% net-revenue interest to Umiat LLC. Because of Arctic Falcon's position, Renaissance and Rutter felt entitled to do the same, contributing only an 80% net-revenue interest in their lease. Mark Landt, Renaissance's principal negotiator, explained that "our position was, if he's going to retain an override, then we're going to retain an override." Therefore, Renaissance contributed only an 80% net-revenue interest, retaining a 3.75% ORRI. This 3.75% ORRI, the subject of this litigation, thus appears to have been an incidental creation of the negotiations with Arctic Falcon. The 3.75% ORRI was apparently unplanned, and there was never any agreement discussing it.

The operating agreement of Umiat LLC provided that Renaissance and Rutter would share the costs of developing the leases, up to $25 million. The terms of the operating agreement provided that if either party failed to contribute its share of the costs, then that party would forfeit its membership in Umiat LLC.

Under the terms of the operating agreement, Renaissance was the manager of Umi-

---

during the entire term of the lease." *C.I.R. v. P.G. Lake, Inc.*, 356 U.S. 260, 262 n. 1, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958) (quoting *Anderson v.*

*Helvering*, 310 U.S. 404, 409, 60 S.Ct. 952, 84 L.Ed. 1277 (1940)).

at LLC. As Renaissance began incurring expenses in developing the Umiat leases, it sent "cash calls" to Rutter. Rutter was unable to meet these cash calls. Renaissance eventually notified Rutter that its membership interest in Umiat LLC had been forfeited.

On August 1, 2008, Rutter filed an action seeking declaratory judgment that it was entitled to its half of the 3.75% ORRI. The superior court granted this declaratory judgment, explaining that both Renaissance and Rutter "owned half the lease" and that there was no implied agreement or other "conceptual basis" that would justify awarding Rutter's half of the ORRI to Renaissance.

## III. STANDARD OF REVIEW

We interpret contract language de novo.[5] "We look to four factors when interpreting contracts: (1) the language of the disputed policy provisions; (2) the language of other provisions in the policy; (3) relevant extrinsic evidence; and (4) case law interpreting similar provisions."[6] We review factual findings by the superior court for clear error.[7] "Clear error exists when we are left with a definite and firm conviction that the superior court has made a mistake."[8] We review conclusions of law de novo and will adopt the "rule of law that is most persuasive in light of precedent, reason, and policy."[9]

## IV. DISCUSSION

Renaissance presents two theories for why we should reverse the superior court. First, Renaissance argues that because the ORRI was always in its name, Renaissance held "legal title" and the ORRI could be awarded to Rutter only as an equitable remedy. Renaissance contends that Rutter does not deserve such an equitable remedy. Second, Renaissance argues that there was an implied term of the contract between Renaissance and Rutter that Rutter would forfeit its share of the 3.75% ORRI if it failed to contribute its required share of capital.

### A. Rutter Owns Half Of The ORRI.

Renaissance argues that it holds "legal title to the entire 3.75% overriding royalty interest." Renaissance reasons that the trial court could award part of that interest to Rutter only as an equitable remedy. Renaissance relies on the framework we set out in *Klondike Industries v. Gibson*:

> It is axiomatic that the holders of legal title to a property are entitled to the proceeds of its sale unless a court imposes on the property an equitable remedy, such as a constructive trust, in favor of another. The burden of proof must fall on the party seeking to impose the equitable remedy.... [10]

Renaissance argues that because it has legal title to the 3.75% ORRI, Rutter has the burden of proving that an equitable remedy is appropriate. According to Renaissance, the superior court did not respect this burden and did not make any "finding of fact or state any conclusion of law that Rutter had an equitable right to the ... ORRI."

But the superior court's conclusion that Rutter and Renaissance held title to the 3.75% ORRI on an equal basis is supported by the record. Mark Landt, Renaissance's vice president, acknowledged that it was assumed that Renaissance and Rutter "would split the remaining override on a 50/50 basis." Landt also testified that Renaissance "looked at [Rutter] as a 50/50 partner."

Renaissance supports its claim that it alone had legal title by pointing out that in filings with the federal Bureau of Land Management (BLM), Renaissance was the only listed owner. BLM regulations require that "[e]ach transfer of record title" must "be

**5.** *Dugan v. Atlanta Cas. Cos.*, 113 P.3d 652, 654 (Alaska 2005).

**6.** *Simmons v. Ins. Co. of N. Am.*, 17 P.3d 56, 59 (Alaska 2001).

**7.** *Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 345–46 (Alaska 2006).

**8.** *Id.* at 346 (internal quotation marks and citations omitted).

**9.** *Gilbert M. v. State*, 139 P.3d 581, 586 (Alaska 2006) (quoting *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

**10.** *Klondike Indus. Corp. v. Gibson*, 741 P.2d 1161, 1171 (Alaska 1987).

filed with the proper BLM office on a current form approved by the Director." [11] But it is undisputed that Rutter and Renaissance filed these BLM documents only in Renaissance's name in order to avoid posting two liability bonds.

These BLM filings also do not establish legal title. Form 3000–3 is the form for filing BLM assignments of title.[12] But Form 3000–3 expressly states that it does not actually establish legal title. In the box where a BLM official signifies approval of the assignment, the form states in bold typeface, "This assignment is approved solely for administrative purposes. Approval does not warrant that either party to this assignment holds legal or equitable title to this lease." Similarly, BLM regulations state that "[a]pproval does not warrant or certify that either party to a transfer holds legal or equitable title to a lease." [13] The BLM's commentary in the *Federal Register* when adopting these regulations contains an extensive disclaimer that its filings do not determine legal title.[14] Renaissance claims that the BLM filings function like a property recording system, but this is not accurate. Rather, the filing system appears to be intended to help the BLM administer leases. Form 3000–3's statement that "[t]his assignment is approved solely for administrative purposes" supports such an interpretation. The filing system's apparent purpose is to inform the BLM of the current owner of each lease, sparing the BLM the trouble of having to laboriously investigate to discover who owns each federal lease. Accordingly, the BLM filings do not support Renaissance's claim that it alone "held legal title" to the 3.75% ORRI.

Renaissance also points to the fact that the sales agreement for the lease was in Renaissance's name alone. But while the agreement purchasing the lease from Craig and Zamarello did name only Renaissance as purchaser, the May 23 agreement between Renaissance and Rutter provided that they were purchasing the lease together. Additionally, the operating agreement of Umiat LLC referred to the lease interest acquired from Craig and Zamarello as belonging to both Rutter and Renaissance: "Renaissance Alaska, LLC and Rutter and Wilbanks Corporation shall jointly contribute *their* one hundred (100%) percent working interest and eighty (80%) percent net revenue interest" to Umiat LLC. (Emphasis added.) The fact that Renaissance was the only listed purchaser on the sales agreement was incidental, a product of the parties' desire to avoid posting two bonds with BLM.[15]

Because it is clear from the record that Renaissance acquired the Craig and Zamarello lease for the purpose of developing it alongside Rutter, the superior court was cor-

---

11. 43 C.F.R. § 3106.4–1 (2011).

12. BLM has provided some online guidance for using Form 3000–3, the document used in this case, instructing that for an assignment of a lease to be effective, "[t]hree originally-executed copies of Record Title Interest in a Lease for Oil and Gas or Geothermal Resources, Form 3000–3, the current edition, must be filed in the Bureau of Land Management State Office which administers the affected lease." *Transfer[r]ing and Assigning Oil and Gas Lease Interest*, BUREAU OF LAND MANAGEMENT, http://www.blm.gov/ca/st/en/prog/energy/og/instructions/asgns.html (last visited Oct. 2, 2011).

13. 43 C.F.R. § 3106.7–1 (2011).

14. Supplementary Information, Oil and Gas Leasing, Geothermal Resources Leasing, 53 Fed. Reg. 17340–01 (May 16, 1988) (to be codified at 43 C.F.R. pt. 3000) ("The Bureau of Land Management cannot, and should not, undertake the role of attempting to validate privately arranged agreements between any lessee and its sublessee, or of protecting a lessee's rights under a private arrangement to which the Federal Government is not a party. The Bureau does not have the power or authority to warrant title i[n] such circumstances regardless of whatever administrative examinations may be conducted. The Bureau's policy for over two years has been not to adjudicate transfers of operating rights because it is time-consuming and unnecessary unless there is an independent concern about a transferee's qualifications.").

15. Moreover, it is well established that when one member of a partnership or joint venture acquires property in the name of the partnership or joint venture, that property belongs to the partnership or joint venture. The Restatement (First) of Restitution explains that "[w]here a person in a fiduciary relation to another acquires property, and the acquisition or retention of the property is in violation of his duty as fiduciary, he holds it upon a constructive trust for the other." RESTATEMENT (FIRST) OF RESTITUTION § 190 (1937).

rect in its conclusion that Rutter held title to half of the lease interest, including half of the 3.75% ORRI.

## B. Rutter Did Not Forfeit Its Share Of The 3.75% ORRI.

■ Renaissance's second theory as to why it is entitled to the whole 3.75% ORRI is based on an alleged "gap in the parties' agreement." Renaissance relies on *Rego v. Decker*, in which we explained that "courts should fill gaps in contracts to ensure fairness where the reasonable expectations of the parties are fairly clear" but "courts should not impose on a party any performance to which he did not and probably would not have agreed." [16] Renaissance argues that it would not have agreed to a term under which "if Renaissance paid the $10 million [development cost mandatory under the purchase agreement], Rutter would still receive a full half of the remaining 3.75 percent ORRI."

■ "A court may supply an essential term that has been omitted from an otherwise sufficiently defined contract." [17] In *Casey v. Semco Energy*, we explained that courts may fill a gap to "ensure fairness where the reasonable expectations of the parties are clear." [18] We also stated that the "threshold inquiry in determining whether [a] case is an appropriate one for 'gap-filling' is whether, in fact, there is an essential term or circumstance for which the parties failed to plan." [19]

Here, we affirm the superior court's conclusion that there was no "gap" in Renaissance and Rutter's agreement. While the sales contract with Craig and Zamarello and the BLM filings referred only to Renaissance, the May 23 Agreement between Rutter and Renaissance provided that "[u]pon written notice, Renaissance shall grant, convey and assign to Rutter fifty percent (50%) of its right, title and interest." The May 23 Agreement further described how future investments would dilute Rutter's and Renaissance's shares of ownership equally. After

Renaissance acquired the lease, Rutter owned 50% of that interest. Specifically Rutter owned 50% of what Renaissance acquired, which was 100% of the working interest and 84.5% of the net-revenue interest. The federal government was already entitled to 12.5% royalty interest and Craig and Zamarello retained a 3% ORRI.

Two further dispositions took place after the lease was acquired. First, a 0.75% ORRI was granted to the lenders who provided the $1 million necessary to purchase the lease from Craig and Zamarello. The May 23 Agreement provided that outside lenders would fund the entire purchase price, and that part of their compensation would include a 0.75% ORRI taken equally from Rutter's and Renaissance's interests. Rutter arranged this loan. The contract between Rutter and the lenders provided that Renaissance would assign the 0.75% ORRI to the lenders. Second, the Umiat LLC operating agreement provided that Rutter and Renaissance would transfer an 80% net-revenue interest to Umiat LLC. The 3.75% ORRI is what remained after those dispositions. Renaissance argues that because no agreement discusses the 3.75% ORRI, there was a gap in the agreement. But the mere absence of the phrase "3.75% ORRI" in any contract does not signify that there is in fact a gap in the agreement. The 3.75% ORRI is simply the remainder of a larger lease interest that Renaissance and Rutter agreed they would split 50/50.

Renaissance acknowledges that "[i]t can reasonably be inferred that the parties agreed to share the override 50–50," but Renaissance argues that this split was contingent on Rutter paying half of the $10 million minimum spending requirement under the sales agreement with Craig and Zamarello. According to Renaissance, there is a gap in the parties' agreement because there was no provision discussing what would happen to Rutter's ORRI if Rutter did not contribute its share of the $10 million. But

---

**16.** 482 P.2d 834, 837 (Alaska 1971).

**17.** *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 386 (Alaska 2004).

**18.** *Id.*

**19.** *Id.*

the record supports the superior court's conclusion that Rutter's half of the ORRI was not contingent on its contribution to the minimum spending requirement. An ORRI owner is not normally obligated to contribute toward development or operation expenses.[20] There is no suggestion here that the parties intended to vary this usual arrangement. To the contrary, the Umiat LLC operating agreement explicitly provided that the LLC would pay for the development of the lease. While at oral argument before us, Renaissance asserted that its contributions to meet the minimum spending requirement were separate from its contributions to the LLC, but the existence of an extensive operating agreement makes clear that the parties intended Umiat LLC to be the vehicle through which they met the minimum spending requirement. There is no contract term, implied or otherwise, linking the 3.75% ORRI to the minimum spending requirement. Both Renaissance and Rutter were sophisticated parties and the agreements between them were extensively negotiated. Had Renaissance and Rutter wished to include an express term linking the ORRI to the minimum spending requirement, they could have done so. Since no express or implied term provided that Rutter would forfeit its half of the ORRI if it did not contribute to the $10 million spending requirement, we affirm the superior court's determination that Rutter did not forfeit its share of the ORRI.

## V. CONCLUSION

We AFFIRM the superior court's judgment that Rutter may retain its share of the 3.75% ORRI.

---

20. EARL A. BROWN, THE LAW OF OIL AND GAS LEASES § 17.01(1) (2d ed. 1986) ("An 'overriding royalty' interest is a given interest severed out of the working interest or lessee's share of the oil, and not charged with any of the cost or expense of development or operation. This is true whether the overriding royalty is created by reservation when the original lessee transfers his interest by assignment or sublease, or is created by grant when the original lessee conveys such fractional share to a third person.").