John KROSSA, Appellant,

v.

ALL ALASKAN SEAFOODS, INC., an Alaska Corporation; AAS–DMP Management, L.P., a Washington Limited Partnership; Shelikof Maritime, Inc., an Alaska Corporation, Appellees.

No. S–9576.

Supreme Court of Alaska.

Oct. 12, 2001.

Rehearing Denied Dec. 27, 2001.

**412**

Shane C. Carew, Seattle, WA, for Appellant.

Gregory R. Henrikson and Daniel T. Quinn, Richmond & Quinn, Anchorage, and Tom Montgomery, Montgomery Scarp, PLLC, Seattle, WA, for Appellees.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. *INTRODUCTION*

John Krossa signed a contract with All Alaskan Seafoods to fish for crab in exchange for a percentage of the "gross receipts" from the excursion. After about a week fishing in Russian waters, he learned that due to the unusual structure of All Alaskan's business venture, the boat on which he fished would not sell the crab or receive "gross receipts" in the conventional sense. Rather, All Alaskan calculated crew shares based on a complicated formula using a fixed price per pound of crab caught. Krossa fulfilled the remainder of the contract and returned for a second term, this time under a contract which made explicit All Alaskan's payment formula. He later sued for breach of the first contract. The superior court held that because there was no meeting of the minds as to the meaning of "gross receipts," no contract existed until Krossa learned All Alaskan's terms and ratified them by his actions. We affirm the superior court's holding that, after one week of work, Krossa accepted All Alaskan's payment terms and the parties formed a contract. For the week during which Krossa worked without a contract, he has already received reasonable compensation. We therefore conclude that the superior court correctly denied any additional damages.

## II. *FACTS AND PROCEEDINGS*

In 1994 All Alaskan Seafoods formed a joint venture with a Russian company, Dalmoreproduct, which owned the rights to a quota of crab in Russian waters. All Alaskan provided catcher vessels, a processing ship, and experienced crews that could teach their Russian counterparts how to catch and process crab for the frozen crab market. Dalmoreproduct apparently retained ownership of the crab and received all direct profits from the venture. The Russian company then paid All Alaskan a management fee.

As part of its initial deal with Dalmoreproduct, All Alaskan developed an unusual formula for paying crew members. Because the boats passed the crab directly to Dalmoreproduct rather than themselves selling the crab to processors, the crew members were not compensated based on the price brought by their catch. Instead, they were compensated based on an artificial rate of $.50 per pound. This figure was well below the market rate, but the All Alaskan crew share amounted to nearly 100% of the total crab captured; by contrast, a typical crew in Alaska waters might be paid based on the price of the crab sold by the boat, but be paid for only 35–40% of the total catch. In addition, All Alaskan did not take the usual deductions out of the crew members' earnings for fuel, bait, and loss of gear.

Before the venture began, All Alaskan's crab processing vessel was destroyed in a fire; thereafter, some of All Alaskan's fishing vessels had to spend time hauling the catch the long distance to the replacement processing vessel instead of fishing. As a result, All Alaskan added another unusual aspect to their crew contract: Crew compensation was based on the crab delivered by all ten boats in the fleet collectively, rather than on the deliveries of each individual boat. Hence, each person's compensation was based on the pooled catch of the entire fleet.

The resulting payment formula was somewhat complicated. As later expressed in a contract spelling out its terms, it paid crew members

> [gross weight of processed crab for the season] divided by 0.64 (the recovery rate) to arrive at the estimated raw weight of fish caught by the fleet during the season. This gross poundage will be multiplied by $0.50 per pound for all species of crab caught, then divided by the number of boats in the fleet, then multiplied by the crewmember's crewshare percentage of ——%, to arrive at a full season share aboard the vessel at the crewmember's percentage. This number will be divided by the number of days in the season, to arrive at a daily rate at the crewmember's percentage. The crewmember's pay will then be calculated based on the number of days aboard the vessel, minus $20.00 per day for groceries.

This formula compensated the crew at a sufficiently competitive rate that some crew

members—including the plaintiff in this case—returned to the fleet for additional work under the same terms.

Although All Alaskan explained its payment formula verbally and through informational meetings with some contractors, it apparently failed in many cases to ensure that individual contractors understood the formula prior to embarking on the venture. At least four lawsuits, including this one, have arisen based on the contracts used in 1994 and early 1995.[1] In some of the suits, courts concluded that All Alaskan had never explained the payment system to particular plaintiffs. In this case, the superior court concluded that All Alaskan did at the start of the fishing season "make more than reasonable efforts to describe the specific terms" by holding meetings in which the payment formula was explained and written pay projections based on the $.50 price were provided to the crew. However, Krossa apparently did not attend a meeting because he hired on in Juneau later in the season. The contract that he signed stated simply:

> I understand that my share to be paid is 9% of the gross receipts after local taxes which may apply, if any. In addition, groceries will be charged at $20.00 per day.[2]

Although this language is apparently similar to language typically used in Alaska crab fishing contracts, it did not refer to a typical financial arrangement. As the Court of Appeals for the Ninth Circuit explained in an unpublished decision considering the same All Alaskan contract:

> In the Alaska fishery, the boat owns the crab and sells it. As the judge found, "gross receipts" means the number of pounds caught and sold multiplied by the price per pound, which is to say, what the boat gets paid. That trade custom could not apply in this case, because the boat did not own the crab. Nor was the crab deliv-

ered to processing boats that paid for it, as was usual in the trade. Instead, the engagement with the Russians (the terms of which the fishermen did not know in any detail) established that the Russians would own the crab from the time it was caught, and the boat would not sell the crab at all. On behalf of the Russian owners, the boats delivered the crab to processing vessels for processing and delivery to the Japanese customers. There were no fish tickets or invoices to show how much crab each vessel delivered, and all ten boats' catches were added together and divided by ten, to get a figure for each boat, unlike the usual fishing voyage. Thus there were no "gross receipts" in the customary sense that the words were used in the trade.[3]

As the Ninth Circuit's opinion also pointed out, applying the conventional definition of gross receipts as "what the boat is paid for the fish it delivers," gross receipts in this venture were zero.[4]

John Krossa joined the venture as a deckhand on the F/V SHELIKOF in Juneau in April of 1995. He spoke to an All Alaskan representative who told him that he would receive a 9% crew share, but apparently did not explain the compensation system beyond that. He flew to Russia to join the ship, and signed his contract there. The superior court found that Krossa's employment began at this time, and that at this time he "may have believed he would make 9% of some total value of the crab" instead of a value based on the $.50 figure.

The SHELIKOF spent about a week in the crabbing grounds and then delivered the crab to an All Alaskan processing vessel. The superior court determined that during this initial period of about a week, the parties still "had different impressions of how to calculate the crew shares." But it found that after the first crab delivery, Krossa came to

---

1. See *Narte v. All Alaskan Seafoods, Inc.* (*Narte II*), 211 F.3d 1274, 2000 WL 237923 (9th Cir., March 1, 2000) (unpublished), *aff'g Narte v. All Alaskan Seafoods, Inc.* (*Narte I*), No. C95–794WD (W.D.Wash., July 31, 1997); *Paul v. All Alaskan Seafoods, Inc.*, 106 Wash.App. 406, 24 P.3d 447 (2001); *Domaschk v. All Alaskan Seafoods, Inc.*, No. 3AN–95–7190 Ci. (Alaska Super., May 27, 1997).

2. The contract produced for trial was not Krossa's but that of another crew member. The parties agreed, however, that the terms were the same as those of Krossa's contract.

3. *Narte II*, at *1.

4. *Id.* at *3.

understand the terms offered by All Alaskan. The superior court found non-credible Krossa's testimony that he asked the captain about the pay rate and was not told. It found that Krossa was "at best being willfully ignorant of reality" if he did not know other members' crew shares and realize that his assumption that he would earn over $400,000 for the three-month job was unreasonable. Krossa eventually received written explanation of All Alaskan's pay arrangement from the captain.

The superior court also found that after the first week of fishing, when Krossa learned of All Alaskan's intended payment terms, he accepted them. At that point, it held, a meeting of minds was achieved and a valid contract was formed. The court noted that Krossa later demonstrated his willingness to work under All Alaskan's contractual terms by coming back for a second term under the same contract. Krossa later sought to return for a third contractual term with All Alaskan.

The superior court further found that All Alaskan's terms were reasonable—as evidenced by the fact that Krossa earned more money than in any previous season and returned for more work under the same payment formula. But it found that Krossa's claimed initial expectation that he would earn over $400,000 for three months' work was not reasonable. The court noted that if Krossa's initial interpretation of the contract were correct then an inordinately high percentage—at least 81%—of revenues from the venture would go to crew payment alone.

The superior court also concluded that Krossa had not presented sufficient evidence to justify additional contract damages for the week-long period between when Krossa signed the contract and when he came to understand All Alaskan's terms. Although Krossa attempted to use the market price of crab in Japan and Alaska as a basis for calculation, the court found these figures unrealistic as a basis for determining what price was received for the crab caught in the Russian venture. Instead, the superior court concluded that no payment in excess of the sum already paid by All Alaskan under its contract terms was due to Krossa for the first week of fishing.

## III. STANDARD OF REVIEW

We review questions of law de novo and apply the de novo standard of review to a trial court's interpretation of a written contract if that interpretation was based exclusively on documentary evidence.[5] We apply the clearly erroneous standard when the trial court has relied on extrinsic testimonial evidence in interpreting a contract.[6] In this case, the trial court's conclusions regarding what the parties intended and what intentions or assumptions were reasonable under the circumstances depended in large part on witness testimony. We review the trial court's factual findings for clear error and do not "weigh conflicting evidence or assess the credibility of witnesses; these are functions peculiarly within the province of the trial court."[7]

## IV. DISCUSSION

### A. Alaska Principles of Contract Interpretation, and Not Federal Maritime Law, Govern this Case.

The Constitution vests admiralty jurisdiction in the federal courts.[8] However, we adjudicate admiralty claims under the "saving to suitors" clause of 28 U.S.C. § 1333[9] and apply state law unless that law "works material prejudice to the characteristic features of the general maritime law or interferes with the proper harmony and uniformity of that law in its international and

---

**5.** See Klosterman v. Hickel Inv. Co., 821 P.2d 118, 122 (Alaska 1991).

**6.** See id.

**7.** Ursin Seafoods, Inc. v. Keener Packing Co., 741 P.2d 1175, 1178 (Alaska 1987).

**8.** See U.S. Const. art. III, § 2, cl. 1.

**9.** 28 U.S.C. § 1333 provides in part that

[t]he district courts shall have original jurisdiction, exclusive of the courts of the States, of: (1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases other remedies to which they are otherwise entitled.

interstate relations."[10] Because application of Alaska's contract law in this case does not interfere with federal maritime law, Alaska law governs this case. Although Krossa cites federal cases for several principles which he claims should apply, he gives no indication that these cases represent essential features of federal law which should preempt Alaska's principles of contract interpretation, nor is it clear that the cases even support his position.[11]

**B.** *The Written Agreement Signed by Krossa Did Not Constitute a Valid Contract.*

 The superior court correctly concluded that the agreement signed by Krossa prior to embarking on the SHELIKOF, which referred to compensation based on "gross receipts," was not a valid contract. When a phrase in an agreement is differently understood by the contracting parties and the disputed phrase is sufficiently ambiguous to reasonably support the different understandings, no contract exists.[12] The superior court made a factual finding that between the time when Krossa signed the contract and the time of the first crab delivery about a week later, the parties had different understandings of the term "gross receipts." Krossa does not dispute this finding. Therefore, if the term "gross receipts" as used in the written agreement had no plain meaning and was instead ambiguous, we must conclude that no contract existed during that time. "A contract is ambiguous only if, taken as a whole, it is reasonably subject to differing interpretations."[13]

*1. The term "gross receipts" is ambiguous.*

 The parties agree that gross receipts should be defined as weight times price, but disagree about what price should be inserted into this formula. Krossa argues that market price must be used in calculating gross receipts. All Alaskan maintains that while gross receipts may typically be calculated based on the price actually received by boats selling crab, no such figure exists in this case because the boats never owned or sold the crab.[14] Therefore, it argues, "gross

**10.** *Hughes v. Foster Wheeler Co.*, 932 P.2d 784, 787 (Alaska 1997) (quoting *American Dredging Co. v. Miller*, 510 U.S. 443, 446–47, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994)).

Although the contract in this case included a choice of law clause calling for application of Alaska or Washington law, a choice of law clause may not defeat federal preemption and federal law. *See Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 227, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (noting that federal maritime law displaces state common law remedies and that parties may not elect which law will govern).

**11.** Krossa claims that under *Grivas v. Alianza Compania Armadora, S.A.*, 276 F.2d 822 (2d Cir. 1960), he is owed damages equal to what he expected to be paid under the contract—over $400,000. However, that case does not support such a broad rule. He also argues that under federal law "articles signed after the port of departure are not binding upon the seaman." However, the cases he cites stand for no more then the general principle that "[a]dmiralty looks with disfavor on a contract of employment entered into while the ship is at sea." *Mateo v. M/S KISO*, 805 F.Supp. 761, 776 (N.D.Cal.1991) (quoting I.M. Norris, *The Law of Seamen* § 6.4, at 179 (4th ed.1985)); *see The Theodore Perry*, 23 F. Cas. 914 (E.D.Mich.1878). Finally, Krossa suggests that parol evidence may be applied as against shipowners but not seamen. However, the cases he cites refer only to common law parol evidence rules and not to a special rule governing maritime cases. *See id.; Bender v. Waterman S.S. Corp.*, 69 F.Supp. 15, 19–20 (E.D.Pa.1946).

**12.** *See Salmine v. Knagin*, 645 P.2d 148, 150–51 (Alaska 1982) (material misunderstanding about meaning of a contract term can prevent formation of contract); 2 Richard A. Lord, *Williston on Contracts* § 6:58, at 700–01 (4th ed.1991) (same); *see also id.* at 695–97 ("As a general principle, a party to a contract is bound by his express language, and cannot contradict the meaning of his words by denying that he intended that meaning.").

**13.** *Williams v. Crawford*, 982 P.2d 250, 253 (Alaska 1999).

**14.** Krossa claims that All Alaskan conceded below that Krossa's definition of gross receipts is correct. But All Alaskan's definition below was the same definition it now advances before us.

Krossa further argues that because the contract contained an integration clause, the parol evidence rule precludes consideration of extrinsic evidence in construing its meaning. But the parol evidence rule applies only after preliminary determination of what the contract means. *See Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist.*, 778 P.2d 581, 583 (Alaska

receipts" should be defined by the artificial figure of $.50 per pound which All Alaskan intended to offer.

In the context of the Dalmoreproduct/All Alaskan business venture, the term "gross receipts" is ambiguous. *Black's Law Dictionary* defines gross receipts as "the total amount of money or the value of other considerations received from selling property or from performing services." [15] Following this definition, the SHELIKOF's "gross receipts" were zero, since the vessel never owned or sold any crab. All Alaskan itself received payment for services that it provided to Dalmoreproduct, but it would be absurd to interpret the contract as promising a single crew member 9% of the company's gross receipts from the entire venture. Neither of these possible literal interpretations of the term "gross receipts" is plausible; therefore, the term is ambiguous. [16]

Because the plain language of the written agreement was ambiguous and the parties in fact understood the agreement differently, the superior court correctly concluded that no valid contract existed during the first week that Krossa worked on the SHELIKOF.

### 2. *Collateral estoppel*

Krossa argues that the meaning of "gross receipts" in this case was established in other cases arising from the same All Alaskan contract. He claims that All Alaskan is collaterally estopped from relitigating the meaning of the term. Krossa did not squarely raise this claim to the superior court, and it is therefore arguably waived. [17] However, neither of the cases cited by Krossa supports collateral estoppel in any event. We have explained that collateral estoppel bars the relitigation of an issue when

(1) the party against whom the preclusion is employed was a party to or in privity with a party to the first action; (2) the issue precluded from relitigation is identical to the issue decided in the first action; (3) the issue was resolved by a final judgment on the merits; and (4) the determination of the issue was essential to the final judgment. [18]

Krossa first claims that the meaning of the term "gross receipts" in the contract was settled as a matter of law by an Alaska superior court's order granting partial summary judgment in *Domaschk v. All Alaskan Seafoods, Inc.* [19] But the issue decided in that case is not identical to the one posed by this case because the *Domaschk* court's order

---

1989). And "[e]xtrinsic evidence may always be received on the question of meaning." *Id.* at 584. We have explained:

> The parol evidence rule does not apply "where a contract has been formed as a result of misrepresentation or mutual mistake." [Where a party offered parol evidence] to show that the parties did not intend that the [contract] had the meaning the [other party] ascribed to it, not to vary or contradict the terms of the written contract . . . [t]his was a permissible use of extrinsic evidence to prove mutual mistake.

*Philbin v. Matanuska–Susitna Borough*, 991 P.2d 1263, 1270 (Alaska 1999) (footnote omitted).

**15.** *Black's Law Dictionary* 633 (5th ed.1979).

**16.** Krossa's brief to this court could be interpreted as arguing that he relied on an established conventional meaning of the term "gross receipts." However, because Krossa did not squarely raise this point before the superior court, that court issued no factual finding as to whether "gross receipts" has a conventional meaning. Even where conventional meaning is established, however, we have previously declined to rely on that meaning in interpreting a

contract where it was not clear that both parties intended conventional meaning to apply. *See Little Susitna Constr. Co. v. Soil Processing, Inc.*, 944 P.2d 20, 22–25 (Alaska 1997) (rejecting claim that a particular customary definition of the term "turnkey" should be read into a contract and instead upholding jury instruction that meaning of term depended on parties' reasonable understandings and intentions).

**17.** *See Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985) (issue not raised in trial court ordinarily not reviewable on appeal). Krossa did argue below that *Domaschk* and *Narte* established the meaning of the term "gross receipts" in this contract, but did not frame his argument in terms of collateral estoppel or address the legal prerequisites for application of that doctrine.

**18.** *Alaska Contracting & Consulting, Inc. v. Alaska Dep't of Labor*, 8 P.3d 340, 344–45 (Alaska 2000) (quoting *Renwick v. State, Bd. of Marine Pilots*, 971 P.2d 631, 634 (Alaska 1999)).

**19.** No. 3AN–95–7190 Ci. (Alaska Super., May 27, 1997).

depended on application of a federal law, 46 U.S.C. § 10601, which is not applicable here.[20] Moreover, the order granting partial summary judgment was not a "final judgment" for purposes of collateral estoppel.[21]

Krossa also claims that *Narte v. All Alaskan Seafoods*, a federal district court case construing the same All Alaskan contract, determined the meaning of "gross receipts."[22] But that case determined only the meaning of the term as understood by the particular parties in that case; the *Narte* court emphasized that its findings were intended to apply only to the plaintiffs in that case and not to any other parties or potential claims. *Narte* did not address the reasonable expectations of the parties in this case, and therefore has no collateral estoppel effect.

### C. The Parties Formed a Valid Contract When Krossa Accepted the Terms Offered by All Alaska.

#### 1. Krossa ratified All Alaskan's terms.

■ The superior court found that Krossa learned of All Alaskan's payment formula after about one week on the SHELIKOF, and that at that time "he accepted the meaning intended by All Alaskan," thereby forming a contract.

■ Because we "give effect to the parties' reasonable expectations"[23] in interpreting a contract, and because the superior court found that after the first week the parties both reasonably expected that Krossa would be paid based on All Alaskan's payment formula, we affirm the superior court's holding regarding contract formation.

We have explained that although a party may avoid a contract based on mistake or misrepresentation regarding the contract's meaning, the party loses power to avoid the contract

> if, after he knows or has reason to know of the mistake or non-fraudulent misrepresentation ... he manifests to the other party his intention to affirm it or acts with respect to anything he has received in a manner inconsistent with disaffirmance, or he does not within a reasonable time manifest to the other party his intention to avoid it.[24]

Krossa does not challenge the evidentiary sufficiency of the superior court's findings that he accepted All Alaskan's terms and that his acceptance was "further confirmed by his asking to return immediately for another contract that he signed in August, 1995, which included explicitly all the terms [intended by All Alaskan in the first contract]." Nor does he offer evidence that he manifested intent to avoid the contract at any point during the term of his first contract. Therefore, the trial court was correct in its conclusion that Krossa ratified the contract by his actions.

#### 2. Krossa does not have a valid duress claim.

■ Krossa argues that even if he ratified the contract, that ratification was invalid because he acted under duress.

■ Krossa waived this argument by not raising it below. We will not consider on appeal new arguments which (1) "depend on new or controverted facts," (2) are not closely related to the appellant's arguments at trial,

---

20. *See id.* 46 U.S.C. § 10601 requires written contracts for fishing vessels on voyages from United States ports. *See* U.S.C. § 10601(a)(2) (2000). It is not applicable in this case because the SHELIKOF was on a voyage from a Russian port.

21. *See* Alaska Civil Rule 54(b) ("any order or other form of decision, however designated, which adjudicates fewer than all of the claims [in a case] ... is subject to revision at any time before the entry of judgment adjudicating all the claims"); *Briggs v. State, Dep't of Pub. Safety*, 732 P.2d 1078, 1082 (Alaska 1987) (collateral estoppel arises only from judgment that is "suffi-

ciently firm to be accorded conclusive effect" and that is subject to appeal).

22. No. C95–794WD (W.D.Wash., July 31, 1997), *affirmed by Narte v. All Alaskan Seafoods, Inc. (Narte II)*, 211 F.3d 1274, 2000 WL 237923 (9th Cir., March 1, 2000).

23. *Williams v. Crawford*, 982 P.2d 250, 253 (Alaska 1999).

24. *Thorstenson v. ARCO Alaska, Inc.*, 780 P.2d 371, 374 (Alaska 1989) (internal quotations and citations omitted).

and (3) could not have been gleaned from the pleadings, unless the new issue raised establishes plain error.[25] Krossa's duress claim depends on factual claims regarding his financial situation and the feasibility of leaving the SHELIKOF when he learned of All Alaskan's payment terms; the superior court reached no factual findings on this issue because Krossa made no duress claim below. A duress argument could not have been gleaned from Krossa's argument below, since at the outset of this case he sought enforcement of his interpretation of the contract. In *Hill v. Ames,* we considered a similar waiver issue: One party brought suit to enforce an alleged oral contract, lost that claim, and on appeal argued that the lower court erred by not granting equitable quantum meruit damages.[26] We held:

> While there is evidence in the record which might be relevant to possible relief on theories of quantum meruit or constructive trust, appellee did not have an opportunity to put in countervailing evidence on those theories, and the court was not apprised that those questions were to be litigated. No motion for leave to amend the complaint was made in the superior court. Therefore, we will not consider these questions on appeal.[27]

Following this precedent, we will not address Krossa's new claim of duress in this appeal.[28]

**D.** *Krossa Has Not Presented a Valid Claim for Damages for the Week During Which He Worked Without a Contract.*

▮ During his first week as a SHELIKOF crew member, Krossa worked without a valid contract. He is entitled to reasonable payment for this period. However, because he has already received reasonable payment, an award of damages is not appropriate.

▮ When parties to a contract dispute do not have a valid contract, plaintiffs may generally recover in quantum meruit for services rendered.[29] The measure of recovery in quantum meruit is the reasonable value of the services rendered to the defendant.[30] In this case, the superior court determined that All Alaskan's actual payment to Krossa based on All Alaskan's payment formula-which amounted to "more than [Krossa] had ever earned previously in a fishing season"—was reasonable. Krossa has already been paid at this reasonable rate for his work during the first week, as well as subsequent weeks after he ratified All Alaskan's terms. He therefore has no valid claim for additional damages.[31]

## V. CONCLUSION

We AFFIRM the superior court's conclusion that no valid contract existed until one week after Krossa began working, and that the parties thereafter created a contract by

**25.** *Arnett v. Baskous,* 856 P.2d 790, 791 n. 1 (Alaska 1993).

**26.** 606 P.2d 388 (Alaska 1980).

**27.** *Id.* at 390.

**28.** We note that even if Krossa's duress claim were not waived, it would probably fail. Duress exists where "(1) one party involuntarily accepted the terms of another, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of coercive acts of the other party." *Totem Marine Tug & Barge, Inc. v. Alyeska Pipeline Serv. Co.,* 584 P.2d 15, 21 (Alaska 1978). Such "coercive acts" will only support a duress claim if they were "wrongful in a moral sense." *Helstrom v. North Slope Borough,* 797 P.2d 1192, 1198 (Alaska 1990). In this case, Krossa did not claim and the superior court did not find that All Alaskan acted in bad faith or intended to trick or coerce Krossa into accepting the terms of the contract.

**29.** *See, e.g., Truly v. Austin,* 744 S.W.2d 934, 936 (Tex.1988); *Ramsey v. Ellis,* 168 Wis.2d 779, 484 N.W.2d 331, 333–34 (1992).

**30.** *See Fairbanks North Star Borough v. Tundra Tours, Inc.,* 719 P.2d 1020, 1029 n. 15 (Alaska 1986) (quoting *Peavey v. Pellandini,* 97 Idaho 655, 551 P.2d 610, 616 (1976)).

**31.** Krossa offered evidence of the price of crab in the Alaskan and Japanese markets to support his damages claim. To the extent that this evidence was intended to support a claim for reasonable compensation, the superior court did not err in finding it too speculative to support a damages calculation.

Krossa also challenges the superior court's alleged reliance on All Alaskan's expert to determine market price. But the superior court did not determine or rely on a market price.

agreeing to the terms offered by All Alaskan. Because Krossa has already been adequately compensated for his work during the period before that contract was created, the superior court correctly denied damages.