INTERNATIONAL SEAFOODS OF ALASKA, INC., an Alaskan Corporation, Appellant,

v.

Danny BISSONETTE, Tom L. Huffer, Everett M. Hurley, Dale L. Weese, Gwen M. Neal, and Ethan Williams, for themselves and on behalf of similarly situated persons, Appellees.

No. S–11568.

Supreme Court of Alaska.

Sept. 1, 2006.

Rehearing Denied Nov. 30, 2006.

John S. Hedland, Hedland, Brennan and Heideman, Anchorage, for Appellant.

William L. Choquette, Choquette & Farleigh, LLC, Anchorage, for Appellees.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

CARPENETI, Justice.

## I. BACKGROUND

A group of commercial salmon fishers from the Egegik district of Bristol Bay sued International Seafoods of Alaska (ISA) alleging that ISA breached its contract by paying a lower price at the end of the season than it had earlier promised. A jury agreed. Because the superior court properly certified the group of fishers as a class, correctly rejected ISA's proposal to use a separate verdict form for each class member, correctly instructed the jury, did not abuse its discretion in imposing limited sanctions on absent class members who did not respond to discovery, and acted within its discretion in augmenting the plaintiffs' attorney's fees under Rule 82, we affirm the superior court in all respects.

## II. FACTS AND PROCEEDINGS

### A. Facts

Appellees are set net salmon fishers in the Egegik District of Bristol Bay who sold red (sockeye) salmon to ISA during the 2000 fishing season. The fishers allege ISA underpaid them for the delivered salmon. They maintain that ISA agreed to pay the "competitive Bay price" for red salmon, which at the time was between $0.65 and $0.70 per pound. ISA argues that it only agreed to pay the posted price of $0.50 per pound.

Buyers in Bristol Bay traditionally pay a posted or grounds price at the time the salmon is delivered. Later in the season, big buyers such as Trident, Peter Pan, or Icicle often set a higher price, and smaller buyers match that price. This is called "matching the majors" or meeting the "bay price." Buyers will then pay the fishers a "retro" bonus at the end of the year to make up the difference between the posted price and the bay price. This practice of paying a base price during the season and then paying a retro later is well accepted in Bristol Bay. An employee of ISA acknowledged this practice, testifying, "Well, when we paid retros, we paid them under the premise that we had to keep our fishermen. If we didn't pay what our competition was paying, then our fishermen would go away. And that's—that's why we paid—that's why we matched other people's prices even if we lost money." The employee further elaborated regarding the fishing season in question:

> Well, in this case, in 2000, everyone knew, because Trident ... came out in the middle of the season and said that they were going to pay 65 cents for the fish. So once Trident, who's the leader in Bristol Bay, comes out and says that, then it's—you know, the discussion's over, really, what people are going to pay. Everybody pretty much knows what they're going to get.

The fishers and buyers learn about increases in the posted price and the anticipated bay price from sources such as the *National Fisherman,* the *Alaska Fisherman's Journal,* Department of Fish and Game publications, and locally posted notices. Since 1987 ISA always paid the bay price or close to it. In the several years leading up to 2000, ISA matched the majors. When ISA's posted price was lower than the competitive bay price, ISA paid retros.

The two main fish buyers on Egegik beach in the years leading up to 2000 were ISA and Big Creek. Big Creek left the Egegik district in 1999 and leased its dock and related facilities to ISA. The fishers expressed concern that ISA would have a monopoly on the Egegik beach for the 2000 season, and that as a result ISA would not pay competitive prices for the salmon.

On May 1, 2000—before the start of the fishing season—ISA sent a letter to all Egegik fishers. The letter stated in part:

> Dear Egegik Fishermen:
>
> Greetings again from everyone here at I.S.A. The 2000 salmon season is ready to kickoff and we wanted to let all of you know that we have acquired the Big Creek Fisheries plant and property. We just wanted to speak to some of the concerns that fishermen have expressed to us. Here they are:
>
> . . . .
>
> 3. Will I.S.A. continue to be competitive with the price?
>
> Yes. We have always done things according to our own costs and sales and we will continue to do that. We know that to keep your business we must be competitive with our price and by acquiring Big Creek we are making a financial commitment to do business on the beach for years to come.

The fishers interpreted this letter to mean that ISA would match the majors and pay the competitive bay price for salmon that season. The fishers focused on the word "competitive," which they contend has a specific meaning in Bristol Bay. According to the fishers, being competitive in Bristol Bay means "paying bay price and [being] competitive with every other fish buyer in the area and the district." Based on common practice in Bristol Bay, ISA's previous course of dealing, and ISA's explicit promise to be "competitive with our price," the fishers argued that they had a contract to provide salmon in exchange for the bay price and that ISA

breached this contract. The fishers also rely on a meeting between fishers and ISA representatives in the summer of 2000, during which ISA allegedly promised to "pay the bay price."

ISA contends on appeal that it made no such promise. ISA looks to the language in the letter regarding its "own costs and sales." The cannery argues on appeal:

> ISA's purpose in utilizing the language relating to its *own* costs and sales was to make clear that the amount to be paid, including any retro payment that might be made at the end of the year, would have to depend upon its own market conditions, and not those of a competitor such as the "major" buyers in Bristol Bay.

(Emphasis in original.)

ISA claims it needed to base its payments on its own profit margin and not that of its competitors. Due to a variety of factors, ISA lost money on the Egegik operation in 2000. Consequently, it determined that it could not pay the retro above the posted price.

### B. Proceedings

Six Egegik fishers filed a class action complaint against ISA on February 28, 2002. The fishers argued that they relied on ISA's representations that the cannery would pay fishers the competitive bay price, and that ISA subsequently failed to pay that price. They requested monetary damages for the difference between the price paid and the bay price. (They also requested damages for "plugging," which refers to a cannery's inability to buy all the fish provided by the fishers, although they later dropped that claim.) They sought pre- and post-judgment interest, costs, and attorney's fees.

In August 2002 plaintiffs moved to certify the suit as a class action. They defined the class as "all fishers in the Egegik District who sold fish to ISA during the 2000 fishing season." Plaintiffs contended that they met the prerequisites for class certification under Civil Rule 23, including numerosity, common-

ality, typicality, and adequacy of representation.

ISA strongly opposed the motion for class certification. It argued that plaintiffs could not meet the numerosity requirement because the class was small and its members easily identifiable. In addition, ISA maintained that the potential claims were sufficiently large to provide adequate incentive for the fishers to pursue them individually. ISA also challenged the adequacy of representation, relying on the fact that only a few fishers attended the meeting at which ISA promised to pay the retro. ISA maintained that fishers not present at the meeting could not claim reliance on an oral contract, and thus the representatives could not properly represent them in the litigation.

Superior Court Judge William F. Morse initially declined to certify the class until plaintiffs provided further evidence of the policy rationales for a class action in accordance with Civil Rules 23(b) and 23(c).[1] After both the fishers and ISA submitted additional information, Judge Morse certified the class, defining it as "[a]ll fishers who, in the year 2000, took salmon from the Egegik District and sold those salmon to International Seafoods of Alaska, Inc."

ISA moved for reconsideration of the certification order which was denied. ISA then petitioned this court to review the superior court's class certification. We denied the petition for review.

ISA next requested that individual fishers who did not answer its interrogatories be excluded or dismissed from the class. ISA declared that fishers "who do not care enough about their claims to devote a few minutes to providing obviously relevant information should have their claims dismissed or they should be excluded from the class." The superior court denied ISA's motion. The court refused to dismiss claims of non-responding absent members, holding that such a severe sanction was not warranted.

---

**1.** Civil Rule 23(b) requires that the representatives demonstrate that certification is necessary (1) to avoid inconsistent or varying adjudications; (2) to avoid impeding the ability of non-parties to protect their interests; or (3) to

achieve the most efficient and fair adjudication. Civil Rule 23(c) requires the court to describe the members of the class and to direct "the best notice practicable" to its members.

Rather, the court restricted the evidence that plaintiffs could introduce at trial to documents or statements that had been provided in discovery. This ruling precluded non-responding plaintiffs from testifying at trial.

ISA again moved for reconsideration. ISA argued that it was prejudiced by the court's ruling because interrogatory responses might have been favorable to it. ISA had hoped to find evidence from absent members that some of the fishers had not received any price information directly from ISA and thus could not reasonably have relied on ISA's alleged representations. The superior court denied ISA's motion. The court acknowledged ISA's argument, but it explained that the negative impact of its decision on the defendant is simply a consequence of the general rule that parties cannot obtain discovery from absent class members. The court held that ISA had not shown sufficient cause to deviate from this general rule.

Throughout trial, ISA continued to argue against the notion of a class action. ISA fought class certification under a variety of guises, particularly in relation to the use of a single jury verdict form and the instruction to the jury that it find a single final price applicable to all fishers. ISA requested jury verdict forms for all 110 members of the class. The court held firm to the single verdict form, stating "[T]hat's the whole point of a class action, . . . you don't have 110 plaintiffs, you have a class."

The jury found that ISA owed an additional amount for the red salmon it purchased from the plaintiffs in Egegik during the 2000 season. It set this amount at $0.17 per pound.

ISA moved for judgment notwithstanding the verdict and for a new trial. ISA argued that Jury Instruction No. 7[2] overrode the jury fact-finding function by declaring as a matter of law that the cannery had entered into a single contract with all the fishers. The cannery argued that even if the jury could have found a single contract, the court erred in establishing that as a matter of law. It maintained that the practical effect of the jury instruction was to require the jury to find the same price for all fishers, even if the overwhelming majority of fishers did not understand that they were entitled to the bay price. The superior court denied ISA's motion.

Meanwhile, the fishers moved for award of attorney's fees. They raised two separate fee issues: (1) what fees should be awarded to the fishers as the prevailing party (fee shifting); and (2) what fees the court, in its discretion, should approve for payment to class counsel from members of the class (fee sharing). Pursuant to the formula outlined in Civil Rule 82(b)(1),[3] the court awarded the fishers attorney's fees of $55,985.46. In addition, the court, as allowed by Civil Rule 82(b)(3), augmented the fee award by $15,000 to account for the additional work generated

2. Instruction No. 7 provided as follows:

In this case the plaintiffs and the defendant, International Seafoods of Alaska, Inc., agree that they entered into a contract. The plaintiffs claim that, under the contract, the defendant promised to pay all plaintiffs what the plaintiffs describe as the competitive price or bay price, to be determined at the end of the season.

The defendant denies that this promise was made. The defendant maintains that it promised to pay all plaintiffs the same price. It claims that it agreed to pay $0.50 per pound with the possibility that it would pay more at the end of the season if its sales and costs permitted a supplemental payment.

You must decide whether a promise to pay a particular price was made as part of the contract. A promise may be implied from conduct or words. The law does not require that the conduct or words be in any special form.

To find that a promise was made as part of the contract, you must decide that it is more likely true than not true that:

(1) The defendant promised the plaintiffs as a group that the defendant would pay the competitive or bay price; and

(2) The defendant's promise was made in exchange for something of value given or promised by the plaintiff.

If you decide that both things are more likely true than not true, then the defendant's promise was part of the contract.

Otherwise, you must return a verdict for the defendant on this claim.

3. Civil Rule 82(b)(1) sets out a schedule for determining attorney's fees. The fees vary based on the amount of the money judgment and whether the case went to trial.

by class issues.[4] Finally, the court increased the baseline percentage paid by the class from twenty-five percent to thirty-five percent, so that class counsel received $212,043.99 through fee sharing.[5]

ISA appeals the court's certification of the class; certain evidentiary and discovery rulings made by the court; the issuance of a single jury verdict form, as well as a jury instruction acknowledging a contract for a single price on fish; and the enhanced award of attorney's fees.

## III. STANDARD OF REVIEW

■ We will overturn the superior court's decision to certify a class only if the court abused its discretion.[6] We will find that the superior court abused its discretion only if we are left with "a definite and firm conviction, after reviewing the record as a whole, that the trial court erred in its ruling."[7] We review rulings on discovery sanctions for abuse of discretion.[8] We also review evidentiary rulings for abuse of discretion.[9]

■ ISA contends that the superior court's determination that ISA entered into a single contract with all fishers and that all fishers were entitled to the same price

"amounted in substance to the grant of a partial directed verdict" in favor of the fishers. We disagree with this characterization and conclude that it was simply a resolution of a question of law, subject to *de novo* review.[10] On questions of law, we adopt the rule of law that is most persuasive in light of precedent, reason, and policy.[11]

■ In reviewing the superior court's rulings on jury instructions, we apply our independent judgment to determine whether the challenged instruction states the law correctly.[12]

■ We will overturn a superior court's award of attorney's fees "only upon a showing of abuse of discretion or a showing that the award is manifestly unreasonable."[13]

## IV. DISCUSSION

### A. The Trial Court Did Not Err in Certifying this Case as a Class Action.

■ ISA first argues that this case never should have been certified as a class action.[14]

In order to be certified as a class, plaintiffs must meet the requirements of Civil Rule 23:

4. Under Civil Rule 82(b)(3), the court may vary an attorney's fee award if, upon consideration of a variety of factors, the court determines that variation is warranted.

5. The court sought to balance its desire to award an increased fee in order to encourage counsel to take on class actions against its fear that too great a fee award would deprive the class of its compensatory damages. The court concluded that an increase from twenty-five percent to thirty-five percent would "encourage counsel to engage in modest class actions that have a relatively low limit on the amount of damages that are possible, but without which few of the class members would be unable to pursue the litigation."

6. *Bartek v. State*, 31 P.3d 100, 101 (Alaska 2001); *State, Dep't of Revenue v. Andrade*, 23 P.3d 58, 65 (Alaska 2001).

7. *City of Kodiak v. Samaniego*, 83 P.3d 1077, 1082 (Alaska 2004); *Buster v. Gale*, 866 P.2d 837, 841 n. 9 (Alaska 1994).

8. *Hikita v. Nichiro Gyogyo Kaisha, Ltd.*, 85 P.3d 458, 460 (Alaska 2004).

9. *City of Bethel v. Peters*, 97 P.3d 822, 825 (Alaska 2004).

10. *Jarvis v. Ensminger*, 134 P.3d 353, 357 (Alaska 2006).

11. *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

12. *Samaniego*, 83 P.3d at 1082.

13. *Feichtinger v. Conant*, 893 P.2d 1266, 1268 (Alaska 1995). *See also Palfy v. Rice*, 473 P.2d 606, 613 (Alaska 1970).

14. ISA opposed class certification at the trial court level and in an interlocutory appeal to the supreme court. The trial court denied the motion opposing certification, and we denied ISA's petition for review. A denial of a petition for review does not constitute a determination of the issue in the case, and it is not a final judgment for purposes of *res judicata*. *Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 763 (Alaska 1977).

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition to these prerequisites, a class action should serve certain policy interests. A class action may be certified if it alleviates risks of inconsistent or varying adjudications or the disposition or impairment of interests of members of the class who are not parties to the adjudications.[15] It may also be certified if common questions predominate, making it a superior method for the fair and efficient adjudication of the controversy.[16]

We conclude that the superior court did not err in ruling that the fishers satisfied each of the prerequisites for a class action. First, they meet the numerosity requirement because the class is numerous and joinder would have been impracticable. The class includes 110 fishers who live in Alaska, Washington, Maryland, Colorado, Oregon, California, and other states. While there is no "magic number" satisfying the numerosity requirement,[17] a proposed class containing more than forty members has been presumed to meet the requirement.[18] In addition, it would have been impracticable to join class members who are so geographically dispersed.

■ Second, the commonality and typicality requirements are met because the plaintiffs share a single legal issue arising out of the same sequence of events: claimed breach of contract by ISA in setting the contract price during the 2000 fishing season. The typicality requirement is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."[19] The commonality requirement is satisfied if "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class."[20] In this case, the fishers' claims all arise out of the failure of ISA to pay the bay price for the delivered fish. Each fisher seeks the same damages—the difference between the competitive bay price and the price ISA actually paid.

■ Finally, because the class representatives have the same interests as the rest of the class and class counsel was competent, representation is adequate. For representation to be adequate, the plaintiff's attorney must be qualified, and there must be no conflict of interest between the named plaintiff and the other members of the class.[21] ISA did not challenge the qualifications of the attorneys representing the class. There is no conflict of interest among class members because all plaintiffs had the same interests and the same damages and any fisher who did not wish to participate in the litigation had the opportunity to opt out.

On a policy level, class certification was necessary because otherwise the fishers faced a risk of inconsistent adjudications and many of them may have elected not to litigate. Moreover, because questions of law and fact common to the class predominate over questions affecting individual members, it would be more fair and efficient to adjudicate these questions as a class.

The question of class certification in this case was litigated extensively, and Judge

---

**15.** Alaska R. Civ. P. 23(b)(1)(A)-(B).

**16.** Alaska R. Civ. P. 23(b)(3).

**17.** *Miller v. Farmer Bros. Co.,* 115 Wash.App. 815, 64 P.3d 49, 54 n. 1 (2003). *See also Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa. 1989).

**18.** *See Cox v. Am. Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir.1986). We note that Alaska R. Civ. P. 23(a)-(e) is identical to Fed.R.Civ.P. 23(a)-(e). *See also* 1 Herbert Newberg & Alba Conte, Newberg on Class Actions § 3:5, at 247 (4th ed.2002).

**19.** *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997) (citation omitted).

**20.** *Baby Neal ex rel. Kanter v. Casey,* 43 F.3d 48, 56 (3d Cir.1994).

**21.** *Marisol A.,* 126 F.3d at 378.

Morse ultimately rejected ISA's arguments against certification. The court certified the class, defining it as "[a]ll fishers who, in the year 2000, took salmon from the Egegik District and sold those salmon to International Seafoods of Alaska, Inc." ISA has not demonstrated that the superior court abused its discretion in certifying the class. For the reasons set out above, we affirm the class certification.

## B. The Trial Court Did Not Abuse its Discretion in Declining To Impose the Most Severe Sanction on Absent Class Members Who Failed To Respond to Discovery Requests.

■■■ ISA submitted a set of discovery requests to class members via the plaintiffs' attorneys. Many of the passive, absent members did not respond. ISA asked the trial court to sanction non-responding absent members by having their interest in the litigation dismissed or having them excluded from the class. Judge Morse declined to adopt this draconian measure, stating, "That is the most severe discovery sanction and not warranted here." Instead, the court restricted the evidence plaintiffs could introduce at trial to documents or statements that had been provided in discovery. ISA maintains that the superior court abused its discretion when it declined to dismiss or exclude these non-responding absent class members from the litigation.

The primary questions ISA raises are (1) whether non-responding class members should be considered parties for the purposes of discovery, and (2) if so, whether they can be sanctioned for failing to reply to interrogatories.

The United States Supreme Court has stated that non-named class members may

be parties for some purposes, but not for others.[22] "The label 'party' does not indicate an absolute characteristic, but rather a conclusion about the applicability of various procedural rules that may differ based on context."[23] In *Devlin v. Scardelletti,* the Court concluded that non-named class members were parties in the sense of being bound by the settlement.[24] Similarly, non-named class members are parties in the sense that the filing of an action on behalf of the class tolls a statute of limitations against them.[25] Otherwise all class members would be required to intervene to preserve their claims, thereby defeating the goals of simplification and efficiency.[26]

In *Transamerican Refining Corp. v. Dravo,*[27] a federal district court considered whether absent class members were parties for the purposes of discovery. The court noted that Federal Rules of Civil Procedure 33 and 34 do not provide for discovery against absent class members as a matter of course.[28] However, it noted that the majority of courts considering the scope of discovery against absent class members have granted discovery via interrogatories when: (1) the information requested is relevant to the decision of common questions; (2) the discovery requests are offered in good faith and are not overly burdensome; and (3) the information is not available from the class representative parties.[29] The court in *Dravo* determined that limited discovery under the circumstances was warranted because the discovery sought was relevant to the decision of common questions and may have been known only to absent class members.[30]

The Seventh Circuit addressed the same question in *Brennan v. Midwestern United Life Insurance Co.*[31] In that case, the court concluded that absent class members may be

**22.** *Devlin v. Scardelletti,* 536 U.S. 1, 9–10, 122 S.Ct. 2005, 153 L.Ed.2d 27 (2002).

**23.** *Id.* at 10, 122 S.Ct. 2005. Although bound by the settlement, non-named class members who objected at the settlement fairness hearing could appeal the approval of the settlement. *Id.*

**24.** *Id.*

**25.** *Id.*

**26.** *Id.*

**27.** 139 F.R.D. 619 (S.D.Tex.1991).

**28.** *Id.* at 621.

**29.** *Id.*

**30.** *Id.* at 622.

**31.** 450 F.2d 999 (7th Cir.1971).

required to submit to discovery, and that sanctions are available to compel compliance with such discovery orders.[32] However, the court also acknowledged that dismissal of absent class members' claims is a drastic sanction.[33] Ultimately, the court held that "[w]hile absent class members should not be required to submit to discovery as a matter of course, if the trial judge determines that justice to all parties requires that absent parties furnish certain information, we believe he has the power to authorize the use of the Rule 33 and 34 discovery procedures."[34]

Some courts have rejected *Brennan* and ruled that absent class members are not subject to discovery. In *Gardner v. Awards Marketing Corp.*,[35] the federal district court in Utah held that the defendant could not submit proposed interrogatories to absent class members. Defendants in that case sought to submit interrogatories to all members of the class. The court refused this request in part because "it would be incompatible with the rationale of Rule 23, an undue burden upon the members of the class, unnecessary, and unjustifiably dilatory" to permit the proposed interrogatories.[36] The court warned against the danger of "irreconcilable conflicts between the class action concept and otherwise permissible discovery," and concluded that interrogatories should be authorized only upon a strong showing of necessity or likely material aid in resolving common questions.[37]

■ It is clear from these cases that a trial court has broad discretion to choose whether to impose any sanctions at all on the non-responding class members, as well as the degree of punishment. We will overturn the trial court's decision only if it manifests an abuse of discretion.[38] While the trial court could have chosen to impose more severe sanctions against the non-responding class members in line with *Dravo*, it also had the option of imposing less drastic sanctions. The trial court opted for an intermediate sanction: to exclude from testimony documents not identified or produced and oral statements not disclosed during discovery. Judge Morse was well within his discretion to adopt this measure.

## C. The Trial Court Did Not Err in Refusing To Allow ISA To Place the Complaint into Evidence or in Permitting the Fishers To Elicit Testimony Regarding Witnesses' Subjective Feelings.

■ In its statement of the issues on appeal, ISA asks us to review whether "the trial court erred in refusing to allow defendant to place the complaint into evidence," and whether the court erred in "permitting the fishers to elicit testimony from witnesses as to their subjective feelings about their entitlement and interpretations of statements attributed to the defendant." In its briefing to this court, ISA addresses the issue of the complaint only in a footnote and does not provide any argument as to whether the court abused its discretion in refusing to allow the complaint to be entered as evidence. Thus, this argument is waived.[39]

■ Beyond the statement of the issues, ISA never addressed the final question regarding the propriety of eliciting witnesses' subjective feelings and interpretations of ISA's statements. An issue raised in the points on appeal but not adequately briefed is considered abandoned.[40]

32. *Id.* at 1004.

33. *Id.* at 1003.

34. *Id.* at 1005.

35. 55 F.R.D. 460 (D.Utah 1972).

36. *Id.* at 462.

37. *Id.* at 463.

38. *Hikita v. Nichiro Gyogyo Kaisha, Ltd.*, 85 P.3d 458, 460 (Alaska 2004) ("The superior court has

broad authority to determine appropriate sanctions for discovery violations, and its decisions in this area are subject only to review for abuse of discretion.") (internal citation omitted).

39. *Alderman v. Iditarod Props., Inc.*, 104 P.3d 136, 146 (Alaska 2004) (holding that failure to adequately brief an issue constitutes waiver of the issue).

40. *Id.*

### D. The Trial Court Did Not Err in Giving the Jury a Single Verdict Form.

■ ISA maintains that it had separate contracts with each of the fishers, and that it was entitled to have the jury adjudicate each contract separately, as though this were not a class action. ISA relies on *Krossa v. All Alaskan Seafoods, Inc.*,[41] which it interprets to mean that "a particularized decision is necessary as to each individual claim." We conclude that *Krossa* does not stand for the proposition asserted by ISA.

*Krossa* was not a class action. In that case, fisherman John Krossa signed a contract with All Alaskan Seafoods to fish for crab in exchange for a percentage of the "gross receipts" from the venture.[42] Unfortunately, the parties relied on different interpretations of the contractual phrase regarding payments based on "gross receipts."[43] All Alaskan did not calculate gross receipts in accordance with custom of the trade.[44] Instead of compensating the crew based on the price per pound of the catch—the typical means of determining gross receipts—All Alaskan used a complicated formula based on an artificial, fixed price per pound.[45] The term "gross receipts" was ambiguous and the parties understood the agreement differently.[46] Consequently, until Krossa understood the gross receipts formula employed by All Alaskan, there was no contract.[47]

In deciding *Krossa*, we looked to *Narte v. All Alaskan Seafoods, Inc.*,[48] an unpublished federal district court case addressing the same All Alaskan contract. Krossa attempted to argue that the meaning of "gross receipts" had been established in *Narte*, and

that All Alaskan was collaterally estopped from relitigating the meaning of the phrase.[49] However, we rejected Krossa's argument, noting that the federal district court in *Narte* specifically emphasized that its findings were intended to apply only to the plaintiffs in that case.[50] Thus, we held that the interpretation in *Narte* had no collateral estoppel effect in *Krossa*.[51]

ISA relies on our statement in *Krossa* that *Narte* "determined only the meaning of the term [gross receipts] as understood by the particular parties,"[52] to mean that we can determine the effects of a contractual term only on an individualized basis. Consequently, ISA requested individual verdict forms for each class member. However, ISA's interpretation of *Krossa* and *Narte* ignores the fact that those cases, unlike the current case, were decided individually and not as part of a class action. The parties in *Krossa* and *Narte* sued All Alaskan separately, and in different courts. In contrast, despite ISA's wishes to the contrary, this case has been certified as a class action.

The present case is quite similar to *State, Commercial Fisheries Entry Commission v. Carlson*.[53] In that case, we explained that class action suits are necessary to avoid a multiplicity of duplicative lawsuits.[54] The question in *Carlson* was whether Alaska could charge nonresident commercial fishers more for commercial fishing licenses than it charged resident commercial fishers.[55] The state sought to require that each nonresident commercial fisher file suit on his or her own behalf. We declined to enforce such a requirement because it would result in multiple

---

41. 37 P.3d 411 (Alaska 2001).

42. *Id.* at 413.

43. *Id.*

44. *Id.*

45. *Id.*

46. *Id.* at 417.

47. *Id.*

48. No. C95–794WD (W.D.Wash., July 31, 1997), aff'd, *Narte v. All Alaskan Seafoods, Inc. (Narte*

*II)*, 211 F.3d 1274, 2000 WL 237923 (9th Cir., March 1, 2000) (unpublished).

49. *Krossa*, 37 P.3d at 418.

50. *Id.*

51. *Id.*

52. *Id.*

53. 65 P.3d 851 (Alaska 2003).

54. *Id.* at 872.

55. *Id.* at 853.

duplicative suits.[56] Accordingly, we held that the trial judge's decision to allow named class members to sue on behalf of unnamed class members was proper.[57]

ISA, like the state in *Carlson*, wants each Egegik fisher to file suit individually to enforce the contract for the 2000 fishing season. This would have the same effect as requiring each commercial fisher to sue on his or her own behalf to recover a license overcharge. ISA has already lost its bid to decertify the class and cannot circumvent that decision now by arguing that it is entitled to individual verdicts for each fisher. The fishers in the current case are plaintiffs in a class action. A class of plaintiffs is entitled to the same verdict.[58] The superior court did not abuse its discretion in providing only one verdict form.

### E. The Trial Court Did Not Err in Issuing a Jury Instruction Stating that ISA and the Fishers Entered into a Contract Under Which ISA Would Pay All Fishers the Same Price.

ISA contends that the trial court erroneously determined as a matter of law that each fisher was entitled to the same price. The cannery states, "[I]t was fundamental error for the court to hold, as a matter of law, that ISA had entered into a single contract with all of the fishers and that all of the fishers were automatically entitled to the same price." ISA contends that the trial court erred by incorporating its conclusion that there was a single contract at a single price "in[to] its jury instructions, particularly instruction number seven." [59] We disagree.

Jury Instruction No. 7 asks jurors to determine whether ISA promised to pay a particular price as part of its contract with the Egegik fishers. Specifically, the instruction says:

In this case the plaintiffs and the defendant, International Seafoods of Alaska, Inc., agree that they entered into a con-

tract. The plaintiffs claim that, under the contract, the defendant promised to pay all plaintiffs what the plaintiffs describe as the competitive price or bay price, to be determined at the end of the season.

The defendant denies that this promise was made. The defendant maintains that it promised to pay all plaintiffs the same price. It claims that it agreed to pay $0.50 per pound with the possibility that it would pay more at the end of the season if its sales and costs permitted a supplemental payment.

*You must decide whether a promise to pay a particular price was made as part of the contract.* A promise may be implied from conduct or words. The law does not require that the conduct or words be in any special form.

*To find that a promise was made as part of the contract, you must decide that it was more likely true than not true that:*

*(1) The defendant promised the plaintiffs as a group that the defendant would pay the competitive or bay price; and*

*(2) The defendant's promise was made in exchange for something of value given or promised by the plaintiff.*

If you decide that both things are more likely true than not true, then the defendant's promise was part of the contract.

Otherwise, you must return a verdict for the defendant on this claim.

(Emphasis added.)

ISA argues that this jury instruction "precluded the jury from determining that different fishers were entitled to different prices based upon their individual contractual arrangements with ISA." However, ISA undercut its own argument by steadfastly maintaining at trial that it entered into the same contract with each fisher and that it was simply contesting the price. Over and over, ISA argued that it had a contract for a single price with all of the Egegik fishers, but that it was at a lower price than the one claimed by the fishers. For example, during opening

---

**56.** *Id.* at 872–73.

**57.** *Id.*

**58.** *Id.*

**59.** Appellant Brief 2.

statement to the jury, counsel for ISA repeatedly contrasted plaintiffs' argument for "the bay price" with "the price" that ISA had agreed to pay. During the argument over jury instructions, ISA stated, "ISA believes everybody's supposed to get the same price, but it's not the price they think they're supposed to get." It also noted, "[Our] position is we said we're going to pay a 50–cent ground price. If our costs and sales justify it, we're going to pay a retro at the end of the year." Later, during closing statements, ISA stated that its price was "50 to 55 cents, depending on where the fish were delivered." Thus, the portion of the jury instruction stating that ISA "maintains that it promised to pay all plaintiffs the same price" and that it "agreed to pay $0.50 per pound with the possibility that it would pay more," accurately reflected ISA's position. The trial court did not err in explaining that position to the jury.

In addition, even if ISA had not actually conceded that it intended to pay a single rate to all Egegik fishers, it failed to prove the existence of multiple contracts for different rates. ISA maintains that there should be a strong presumption of different contracts because there is no signed contract, and because ISA and the fishers interpreted the only written document—the May 1 letter—differently. ISA looks to *Krossa*[60] to justify this argument. In *Krossa*, although all crew members signed identical contracts, some crew members had oral communications with All Alaskan regarding the meaning of the contracts and some did not.[61] Because the contract language in *Krossa* was ambiguous and the parties understood the agreement differently, we concluded that the written agreement signed by Krossa did not constitute a valid contract.[62] ISA analogizes our *Krossa* analysis to assert that its interactions with the Egegik fishers resulted, not in an invalid contract, but rather, in multiple contracts.

ISA's analysis is fundamentally flawed for two reasons. First, the fishers in *Krossa* did not share one common understanding of the compensation system. Rather, some understood gross receipts in its traditional sense, while others had been informed of All Alaskan's unique definition.[63] Thus, we explicitly declined to adopt the meaning of the term "gross receipts" determined by the *Narte* court, even though the fishers in both *Krossa* and *Narte* were suing over the same written agreement.[64] In contrast, the parties in this case do not dispute the meaning of the term "bay price." The question in this case is whether ISA intended to pay the bay price to all Egegik fishers when it told them it would be "competitive," or whether it intended to pay the ground price to all fishers. The jury concluded that ISA agreed to pay all fishers the bay price.

Second, unlike *Krossa*, the question in the present case is not whether the fishers and ISA ever had a valid contract, but rather whether the May 1, 2000 letter changed the terms of that contract. ISA contends that the letter did change the contract as applied to all the Egegik fishers; the fishers disagree. Had the jury determined, in accordance with ISA's argument, that the letter changed the terms of the contract, all fishers would have received only the ground price. Since the jury agreed with the fishers that the letter had no effect on the prior oral contract, all fishers were entitled to a retro payment based on the same price per pound. Either way, the superior court did not err in holding that all fishers were entitled to the same price.

As it turned out, the jury concluded, after hearing all the evidence, that ISA had contracted to pay the fishers the bay price. It interpreted the term "competitive" to refer to the bay price and not to ISA's price margin.

## F. The Trial Court Did Not Abuse Its Discretion in Augmenting the Attorney's Fee Award.

ISA complains that the trial court abused its discretion in augmenting the at-

---

**60.** 37 P.3d 411 (Alaska 2001).

**61.** *Id.* at 414.

**62.** *Id.* at 416–17.

**63.** *Id.* at 414.

**64.** *Id.* at 418 (explaining that *Narte* decision did not have collateral estoppel effect on interpretation of meaning of "gross receipts").

torney's fee award by $15,000. Civil Rule 82 calls for partial reimbursement by the non-prevailing party of the fees the prevailing party has incurred. Rule 82(b)(1) establishes a formula tying reimbursement to the amount of the money judgment the prevailing party received. The trial court held that, pursuant to this rule, ISA owed the Egegik fishers $55,985.46, subject to variation under Rule 82(b)(3).

Rule 82(b)(3) permits the court to vary an attorney's fee award. The trial court decided to increase the award based on the work performed and the efficiency of the class action mechanism for the pursuit of this claim. According to the court, ISA benefitted from the class action by avoiding the expense of multiple trials.

ISA challenges this conclusion, declaring that it was disadvantaged rather than advantaged by the class action. But ISA does not cite any authority for reversing the trial court's decision. We conclude that the court did not abuse its discretion in augmenting the plaintiffs' award of attorney's fees.

## V. CONCLUSION

Because the class of fishers was properly certified and all subsequent decisions flowing from this certification, including the single verdict form and Jury Instruction No. 7, were appropriate, because the superior court did not abuse its discretion in sanctioning the absent class members or augmenting attorney's fees awarded to the prevailing party, and because the superior court did not err in refusing to enter the parties' pleadings into evidence, we AFFIRM the disputed rulings of the superior court in all respects.